In the
United States Court of Appeals
For the Seventh Circuit

No. 00-3419

MARK A. WARSCO, Trustee,

Plaintiff-Appellant,

v.

PREFERRED TECHNICAL GROUP,

Defendant-Appellee.

Appeal from the United States District Court
for the Northern District of Indiana, Fort Wayne Division.
No. 00 C 10--William C. Lee, Chief Judge.

ARGUED JANUARY 23, 2001--DECIDED July 3, 2001

Before POSNER, EASTERBROOK and RIPPLE,
Circuit Judges.

RIPPLE, Circuit Judge. Mark Warsco ("the
trustee") is the trustee in bankruptcy
for Presidential, Ltd. ("Presidential").
He filed this suit against Preferred
Technical Group ("PTG") to avoid an
alleged preference made to PTG by
Presidential Holdings, L.L.C. ("LLC").
The parties filed cross motions for
summary judgment in the district court;
the district court granted PTG's motion
and denied the trustee's. The trustee now
appeals. For the reasons set forth in the
following opinion, we reverse the
judgment of the district court and remand
the case for further proceedings.

I

BACKGROUND

A. Facts/1

In 1998, Presidential purchased $2
million worth of assets from PTG.
Presidential executed an unsecured,
subordinated promissory note for $2
million in connection with this
transaction ("the note"). The principal
amount of the note subsequently was
reduced to $1.75 million.

Thereafter, Presidential began

experiencing financial difficulties. Monument Capital Partners 1, L.L.C. ("Monument"), a junior secured creditor of Presidential, was dissatisfied with Presidential's management, and it contacted Hans Rau, an entrepreneur, to see if Rau was interested in purchasing Presidential's assets. Rau apparently accepted Monument's invitation and formed LLC for the express purpose of acquiring Presidential's assets.

At some point during the negotiations between Presidential and LLC, PTG became involved in the discussions, although the exact nature and extent of its involvement are not perfectly clear from the record. The Asset Purchase Agreement ("APA") that memorialized the agreement between Presidential and LLC had a clause that conditioned the transaction on receipt of consent agreements containing releases and waivers from certain parties. PTG apparently was among these parties; it sent a letter dated April 15, 1999, to representatives of Presidential and Monument in which it stated that it would not sign the consent agreement "unless we [PTG] are compensated on an equitable basis for the existing notes we hold against Presidential." R.19, Ex.G./2

On April 26, 1999, PTG sent Monument a "follow up" letter "with regard to the Presidential Sales Agreement and subsequent conversations between [Monument] and [PTG] and with [Presidential]." R.19, Ex.H. In this letter, PTG agreed to sign the required consent agreement "if, at the time of Closing, the parties agree to pay [PTG] the amount of $500,000 to cover its outstanding note and accrued interest thereon." Id. Lastly, PTG stated that, "[i]f the purchase agreement can be modified to include the payment to [PTG], then we can move forward on this transaction." Id.

John Weingardt, the president of Presidential, submitted two affidavits in which he explained the nature of PTG's involvement in the negotiations. In his first affidavit, Weingardt stated that "PTG negotiated with [Presidential] and the entities that financed the sale to [LLC] for a share of the proceeds from the sale of [Presidential's] assets to [LLC]." R.19, Ex.M at 2. In his second

affidavit, Weingardt clarified that, "despite these initial negotiations, such a transaction never occurred. Instead, LLC purchased the Note from PTG, and PTG did not receive any of the proceeds from the sale of [Presidential's] assets." R.22, Ex.A at 2.

Although LLC eventually agreed to purchase the note from PTG for $500,000, it conditioned its purchase of the note on its ability to purchase Presidential's assets. Similarly, it conditioned its purchase of Presidential's assets on its ability to purchase the note from PTG for $500,000 or less. Both Rau and Weingardt submitted affidavits in which they explained that (1) the $500,000 that LLC paid to PTG for the note was not, and was not intended to be, part of the purchase price for Presidential's assets,/3 (2) the $500,000 payment to PTG did not reduce the amount of debt Presidential owed on the note, and (3) Presidential did not exercise any control over how, when, or if PTG was paid for the note.

LLC offered three reasons for why it wished to purchase the note from PTG. First, LLC planned to reduce the principal amount of the note by $750,000 and to apply this amount toward the purchase price it paid for Presidential's assets. Second, LLC thought its purchase of the note would be advantageous to those of Presidential's creditors with which it expected to do business in the future, which did not include PTG. LLC believed that, if it could purchase the note from PTG, Presidential's other unsecured creditors would recover fifty cents on the dollar in the event Presidential declared bankruptcy, whereas PTG received only twenty-nine cents on the dollar for the note. Third, LLC wanted to secure a place as Presidential's largest unsecured creditor so as to occupy "a position of influence" during a potential bankruptcy proceeding. R.16, Ex.D at 3.

The APA that governed the sale of Presidential's assets to LLC defined the purchase price for the assets as (1) $3.425 million in cash,/4 plus (2) the book value of the liabilities LLC assumed,/5 plus (3) $750,000 of debt forbearance on the note LLC would purchase from PTG at the time of closing,/6 plus (4) a post closing

payment ("PCP") of $585,000. The total purchase price was subject to an adjustment; the amount of the adjustment depended on the value of Presidential's working capital at the time of closing./7 If Presidential's working capital was less than $1,255,000, the amount of the adjustment would be $1,255,000 less the value of the working capital. The adjustment would be due from Presidential to LLC, and it would take the form of a decrease in the aggregate amount of the PCP. Similarly, if Presidential's working capital was more than $1,370,000, the amount of the adjustment would be the value of the working capital less $1,370,000. The adjustment would be due from LLC to Presidential, and it would take the form of an increase in the aggregate amount of the PCP.

The transactions between the parties were consummated on May 5, 1999. The closing cash statement reveals that LLC had $4,470,000 on hand in cash at the time of closing. Of that cash, $2,470,325.97 was wired to National City Bank; $908,881.88 was wired to Monument; and $45,792.22 was wired to OHMITE Manufacturing Company. The total value of these three wires was $3.425 million. Additionally, $157,000 was wired to Extruded Metals and $37,500 was wired to Weingardt./8 Last but not least, $500,000 was wired to PTG. The combined value of all these disbursements is $4,119,500, which was $350,500 less than the total amount of cash on hand. The record provides no indication of what the parties did with this additional cash.

Presidential never received its PCP. The value of Presidential's working capital apparently was less than $1,255,000, although the record does not reveal the degree to which it came up short. The resulting adjustment, however, was large enough to wipe out the entire PCP, so that Presidential never received any portion of the $585,000./9

Within one month of the sale of Presidential's assets to LLC, an involuntary bankruptcy petition under Chapter 7 was filed against Presidential. The money Presidential received as a result of the asset sale was sufficient to pay only Presidential's secured creditors. Presidential's unsecured

creditors received nothing from the bankruptcy estate, instead of the fifty cents on the dollar LLC initially thought the asset sale would provide them. The only unsecured creditor to receive any payment was PTG, which received the $500,000 LLC had paid it for the note. The trustee filed this action against PTG to avoid that $500,000 payment as a preference.

B.  Earlier Proceedings

The parties filed cross motions for summary judgment in the district court. The court held that the trustee had failed to prove that the payment to PTG was a preference; therefore, it granted PTG's motion and denied the trustee's. According to the district court, the trustee's case was lacking in two critical respects. The first shortcoming was that the trustee was unable to demonstrate that the payment to PTG was a transfer of an interest of the debtor in property. See 11 U.S.C. sec. 547(b). The district court did not believe that the payment to PTG was part of the purchase price LLC paid to Presidential for its assets. As a result, LLC's independent decision to purchase the note from PTG did not deprive the bankruptcy estate of property it would have had if not for the transfer. Because the trustee was unable to demonstrate that LLC's payment to PTG somehow depleted the bankruptcy estate, he had not established that the payment was an interest of the debtor in property. Thus, the district court held that summary judgment was proper on this basis alone.

Nevertheless, the district court went on to address a second aspect of the trustee's case that, in its view, also served as an alternative basis for summary judgment in favor of PTG. The district court did not believe that the trustee demonstrated that the payment to PTG was for or on account of an antecedent debt owed by Presidential. See 11 U.S.C. sec. 547(b)(2). The key inquiry for the district court on this issue was how PTG applied the payment it received from LLC. The district court did not believe that the $500,000 that PTG received from LLC reduced the amount of debt Presidential owed to the holder of the note; instead, LLC's payment to PTG merely worked a substitution of

creditors. Thus, the payment was not for an antecedent debt, making summary judgment in favor of PTG appropriate on this ground as well.

II

DISCUSSION

A.  Standard of Review

The trustee appeals the district court's entry of summary judgment in favor of PTG. We review a district court's grant of summary judgment de novo, and we view the record and draw all reasonable inferences therefrom in favor of the trustee, the nonmovant in this case. See In re Smith, 966 F.2d 1527, 1529 (7th Cir. 1992). Summary judgment is proper when the "pleadings, depositions, answers to interrogatories, and admissions on file, together with the affidavits, if any, show that there is no genuine issue as to any material fact and that the moving party is entitled to a judgment as a matter of law." Fed. R. Civ. P. 56(c). The nonmovant must show through specific evidence that a triable issue of fact remains on issues on which he bears the burden of proof at trial. See Celotex Corp. v. Catrett, 477 U.S. 317, 324 (1986). "The nonmovant may not rest upon mere allegations in the pleadings or upon conclusory statements in affidavits; it must go beyond the pleadings and support its contentions with proper documentary evidence." Chemsource, Inc. v. Hub Group, Inc., 106 F.3d 1358, 1361 (7th Cir. 1997). With these standards in mind, we turn to the merits of this case.

B.  Section 547

A trustee may avoid certain preferential transfers made from the debtor's estate before the debtor declared bankruptcy. See 11 U.S.C. sec. 547(b). The trustee's power to avoid preferential transfers is designed to further the Bankruptcy Code's central policy of equality of distribution: "[C]reditors of equal priority should receive pro rata shares of the debtor's property." Begier v. IRS, 496 U.S. 53, 58 (1990). Additionally, by preventing the debtor from favoring certain creditors over others and by ensuring an equal distribution, the preference provision helps reduce "the incentive to rush to dismember a

financially unstable debtor." In re Smith, 966 F.2d at 1535.

A transfer of an interest of the debtor in property is preferential, and therefore avoidable, if it (1) was made to or for the benefit of a creditor, (2) was for or on account of an antecedent debt, (3) was made while the debtor was insolvent, (4) was made on or within 90 days before the date of the filing of the petition, and (5) allowed the creditor to receive more than it otherwise would have. See 11 U.S.C. sec. 547(b). PTG concedes that most of these elements are met in this case; the only elements at issue are (1) whether the $500,000 payment to PTG constituted a transfer of an interest of Presidential in property and (2) whether the transfer was for or on account of an antecedent debt. The trustee bears the burden of proving each of these elements. See Boberschmidt v. Soc'y Nat'l Bank (In re Jones), 226 F.3d 917, 921 (7th Cir. 2000).

1. Interest of the Debtor in Property

A transfer is only preferential if what was transferred constituted an interest of the debtor in property. The Bankruptcy Code's definition of a transfer is "expansive," Barnhill v. Johnson, 503 U.S. 393, 400 (1992), and encompasses "every mode, direct or indirect, absolute or conditional, voluntary or involuntary, of disposing of or parting with property or with an interest in property." 11 U.S.C. sec. 101(54)./10 In the typical preference action, the debtor itself transfers something of value to a particular creditor. As the explicit language of the Bankruptcy Code makes clear, however, the transfer need not be made directly by the debtor; indirect transfers made by third parties to a creditor on behalf of the debtor may also be avoidable under the Code. See Dean v. Davis, 242 U.S. 438, 443 (1917) ("Mere circuity of arrangement will not save a transfer which effects a preference from being invalid as such."). This case requires us to determine whether LLC's $500,000 payment to PTG is avoidable as an indirect transfer of an interest of the debtor in property.

"[P]roperty of the debtor subject to the preferential transfer provision is best

understood as that property that would have been part of the estate had it not been transferred before the commencement of bankruptcy proceedings." Begier, 496 U.S. at 58 (internal quotation marks omitted). Courts considering this element of the preference provision have focused on whether the transfer diminished the debtor's estate./11 See, e.g., Buckley v. Jeld-Wen, Inc. (In re Interior Wood Prods. Co.), 986 F.2d 228, 230-31 (8th Cir. 1993); In re Smith, 966 F.2d at 1535-36; Mandross v. Peoples Banking Co. (In re Hartley), 825 F.2d 1067, 1070 (6th Cir. 1987). When a third party pays a creditor of the debtor after having purchased the debtor's assets, the fundamental question in determining whether that payment was property of the debtor is whether the funds used to make the payment were part of the purchase price for the assets. See, e.g., In re Interior Wood, 986 F.2d at 231; Mordy v. Chemcarb, Inc. (In re Food Catering & Housing, Inc.), 971 F.2d 396, 398 (9th Cir. 1992). If the funds the third party used to pay the creditor were consideration for the debtor's sale of its assets, then those funds would have been part of the debtor's estate and would have been available for distribution had they not been transferred to the creditor. On the other hand, if the funds used to pay the creditor were not part of the sale price for the debtor's assets, then it is unlikely that the payment diminished the debtor's estate. Instead, the transaction between the third party and the creditor likely was an independent transaction that did not affect the property in the debtor's estate available for distribution.

In those cases in which courts have held that a preference was given in the context of an asset sale, there is a fairly direct, traceable link between the consideration given for the debtor's assets and the funds used to pay the creditor. For instance, a debtor may sell its assets to a third party, and, as part of the purchase agreement, the third party may agree to assume the debtor's liabilities. When the third party subsequently pays a creditor of the debtor, courts have allowed the bankruptcy trustee to recover the payment as a preference. See In re Food Catering, 971 F.2d at 397-98; Sommers v. Burton (In

re Conard Corp.), 806 F.2d 610, 611-12 (5th Cir. 1986). In such cases, the third party's assumption of the debtor's debt is consideration for the sale of the debtor's assets. See In re Food Catering, 971 F.2d at 398. The debtor effectively transferred to the creditor its right to receive a portion of the sale price equal to the amount of the debt. See In re Conard Corp., 806 F.2d at 612. The result is the same when, instead of transferring the money directly to the creditor, the third party deposits the money into an escrow account over which the debtor has no control. See In re Interior Wood, 986 F.2d at 231. Nor does the result change when the third party, rather than the debtor, specifies which creditor will receive the funds paid into the escrow account. See Feltman v. Bd. of County Comm'rs of Metro. Dade County (In re S.E.L. Maduro (Florida), Inc.), 205 B.R. 987, 992-93 (Bankr. S.D. Fl. 1997).

In contrast to this line of cases are those situations in which two separate transactions occur. See, e.g., Crews v. Shopping Ctr. Equities, Inc. (In re Sneakers Sports Grill, Inc.), 228 B.R. 795 (Bankr. M.D. Fl. 1999). In In re Sneakers, the parties entered into a purchase agreement in which a third party agreed to purchase the debtor's assets. However, the third party conditioned the purchase on its ability to obtain for $50,000 a new lease from the debtor's landlord, who was also a creditor of the debtor. See id. at 797. The third party negotiated an agreement with the landlord in which it paid $100,000 in exchange for a lease and various equipment. See id. at 798. The trustee in bankruptcy filed suit to recover $50,000 of that payment as a preference because the debtor owed the landlord that amount in back rent. The court refused to allow the trustee to avoid the payment because there was no evidence that the $50,000 otherwise would have gone to the debtor. See id. at 800. Instead, the parties testified that the $50,000 payment to the landlord was not connected to the asset sale, that the $50,000 was never to go to the debtor, and that the third party financed each transaction from its own funds. See id. at 798. Based on these facts, the court held that the debtor did not have an interest in the $50,000 because the asset sale and the agreement with the landlord were independent transactions. The

payment to the landlord therefore did not affect the debtor's estate. See id. at 800.

In this case, there is no smoking-gun connection similar to an assumption-of-debt clause between LLC's $500,000 payment to PTG and the purchase price for Presidential's assets./12 Thus, we are left to determine if there is a genuine issue of triable fact as to whether the practical effect of the transactions was to funnel $500,000 of the purchase price for Presidential's assets to PTG, or whether LLC's payment to PTG was truly independent of its purchase of Presidential's assets. We believe that the record evidence permits two rational interpretations of the transactions that occurred in this case. It is clear from the correspondence among the parties to the transaction that PTG was not going to consent to this asset sale unless it received what it considered fair compensation for the note it held against Presidential. In response to this obstacle, the parties may have put their collective heads together to restructure the deal so as to divert $500,000 of the purchase price to PTG without involving Presidential directly in the transfer. Alternatively, LLC may have believed that refusing to appease PTG would threaten the viability of the deal. In order to save the deal and to promote its own business purposes, then, LLC may have decided to pay PTG itself.

PTG maintains that the $500,000 payment it received was not part of the purchase price for Presidential's assets. It argues that its sale of the note to LLC merely substituted one creditor for another so that Presidential's estate was not diminished. PTG also relies on Rau's and Weingardt's affidavits, both of which indicate that the $500,000 was not intended to be part of the purchase price and did not reduce the amount LLC paid for Presidential's assets. To the contrary, asserts PTG, the payment it received allowed Presidential to get more for its assets than it otherwise would have: If LLC had not purchased the note, it would not have given Presidential anything for its assets, let alone the extra $500,000.

The trustee responds by asking us to look at the transaction as a whole.

According to the trustee, the interdependence of the transactions proves that the money PTG received was really part of the purchase price: Because the asset sale was not going to take place without the simultaneous purchase of the note, the payment to PTG was, in effect, consideration for the asset sale. The trustee believes that this characterization of the transactions is supported by the fact that the principal amount due on the note was reduced by $750,000 in connection with the sale and by the fact that PTG received its $500,000 at the time of closing. Lastly, the trustee argues that allowing PTG to receive $500,000 in connection with the sale of Presidential's assets, when no other unsecured creditor received anything from the bankruptcy estate, defeats the policy of equal distribution among creditors.

Despite Rau's and Weingardt's affidavits, which support the view that the payment to PTG was not part of the purchase price for Presidential's assets, we believe that the nature of these transactions precludes summary judgment, at least on the record as presently constituted. The fact that the asset sale and the note purchase were conditioned upon each other indicates that LLC was willing to pay $3.925 million in cash to acquire Presidential's assets, in addition to the value of the other elements of the purchase price. Notably, only $3.425 million of that cash went to Presidential-- or, more accurately, to Presidential's secured creditors-- while the remaining $500,000 went to one unsecured creditor. Furthermore, PTG's letter of April 16 provides a firm indication that the deal between Presidential and LLC was not going to occur unless PTG was paid. Thus, the $500,000 paid to PTG plausibly can be described as consideration for the asset sale.

An additional factor is the $750,000 of debt forbearance that, according to PTG, constituted a portion of the purchase price for Presidential's assets. PTG's claim in this regard appears to be based on an artificial estimate of the real worth of the underlying note. The $750,000 of debt that LLC "forgave" was not worth $750,000 given Presidential's impending bankruptcy. Indeed, we doubt

that it had any worth at all. Consequently, the forbearance may have added nothing of real value to the consideration Presidential received.

Other important questions are posed by the documentation but remain unanswered. For instance, Presidential was slated to receive a $585,000 PCP that never materialized. According to the APA, LLC was not required to make this payment if the value of Presidential's working capital fell below a certain amount. Presidential's working capital was defined as its inventory plus its accounts receivable. The record raises, but leaves unanswered, the question of how LLC would have underestimated the value of this capital as significantly as it must have in order to wipe out the PCP altogether, if it had conducted any reasonable due diligence. However, neither party has given us any indication of how Presidential and LLC reached their initial valuation of the working capital. The APA appears to establish a target range for the value of the capital; if the value of the capital fell below this range, Presidential would owe LLC the difference, and if the value fell above this range, LLC would owe Presidential the difference. The existence of this range suggests the possibility that the parties evaluated the worth of the capital to the best extent they could, but imprecision remained inherent in the valuation process. However, the lack of any explanation in the record as to how the parties agreed on this range also permits the contrary inference that the numbers were chosen to ensure that the PCP would never be made.

The record poses other unanswered questions. PTG claims that one of LLC's goals in purchasing the note was to provide Presidential's remaining unsecured creditors fifty cents on the dollar in the upcoming bankruptcy. Although the APA indicates what assets Presidential retained following the sale to LLC,/13 the record provides no indication of what those remaining assets were worth or how they would be applied to satisfy Presidential's outstanding obligations. The trustee informed us at oral argument that Presidential's unsecured debt was approximately $2 million, not including the amount owed to LLC on the note. In order to provide the remaining unsecured creditors fifty cents

on the dollar, Presidential would have needed $1 million worth of assets remaining in its estate following the sale to LLC. If we disregard the $750,000 of debt forgiveness, which appears to have had little or no value, and the PCP, which never materialized, the value of "substantially all" of Presidential's assets was approximately $3.425 million. R.19 at 2. After payment was made to Presidential's secured creditors, no part of these funds remained to satisfy Presidential's unsecured debt. It is therefore difficult to accept on faith that Presidential was likely to retain $1 million worth of assets following the sale.

There are important questions about these transactions that simply remain unanswered. In particular, we do not know how the parties reached their initial valuation of Presidential's assets. If Presidential received what the parties agreed its assets were worth prior to the time PTG insisted on being paid, it is less likely that the payment to PTG was a preference and more likely that it was a business investment on LLC's part. Similarly, if the actual value of Presidential's working capital was not ascertainable prior to closing, it is more likely that the prospect of a PCP provided valuable consideration to Presidential. We also do not know the value of the assets Presidential retained following the sale./14 If the assets Presidential retained should have been sufficient to provide the remaining unsecured creditors fifty cents on the dollar, that fact would support PTG's claim that its purchase of the note was a business investment designed to placate those particular creditors.

The district court essentially treated this case as a failure on the trustee's part to prove the necessary elements of a preference. We do not believe, however, that the court's determination gives the trustee the benefit of all the inferences available from the record before the court. Indeed, the district court did not discuss the fact that the $750,000 of debt forbearance added no value to the consideration Presidential received for its assets. It also failed to mention the nonpayment of the PCP.

In sum, we believe that the contingent

nature of the asset sale and the note purchase; the $750,000 of false consideration; the ambiguous valuation of Presidential's working capital that resulted in the nonpayment of the $585,000 PCP; and the $500,000 payment to PTG, when considered together as part of one complex transaction, preclude summary judgment on this record. The ambiguous nature of these transactions is heightened by the inadequacy of PTG's explanations for why LLC wanted to purchase the note independently of its purchase of Presidential's assets. These transactions, as documented in this record, are sufficient to satisfy the trustee's burden of producing evidence sufficient to create a genuine issue of material fact as to whether the $500,000 payment to PTG was a transfer of an interest of the debtor in property. Consequently, the district court's grant of summary judgment in favor of PTG on the basis of this factor cannot be sustained at this juncture.

### 2. For or on Account of an Antecedent Debt

Even though PTG was not entitled to summary judgment on the ground that the $500,000 payment it received was not an interest of Presidential in property, summary judgment still would have been proper if the payment was not for or on account of an antecedent debt. An antecedent debt exists when a creditor has a claim against the debtor, even if the claim is unliquidated, unfixed, or contingent. See Energy Coop., Inc. v. Socap Int'l, Ltd. (In re Energy Coop., Inc.), 832 F.2d 997, 1001 (7th Cir. 1987). There is no question in this case that the note PTG held against Presidential was an antecedent debt; instead, the only question is whether the payment PTG received was "for or on account of" that antecedent debt. 11 U.S.C. sec. 547(b)(2).

PTG argues that it could not have been paid for or on account of the antecedent debt because the payment it received merely worked a substitution of creditors and did not reduce the outstanding amount of Presidential's debt. See, e.g., 1 Robert E. Ginsberg & Robert D. Martin, Ginsberg & Martin on Bankruptcy sec. 8.02[D] (4th ed. 2000) ("The key is how

the creditor applies the payment. If it is applied to reduce an existing claim in whole or in part, then the part so applied is avoidable as a preference . . . ."). PTG's argument might have merit if LLC's purchase of the note truly was independent of its purchase of Presidential's assets and if possession of the note provided real value to the owner. As we have already indicated, however, the record does not permit us to draw either of these conclusions.

The documentation in the record indicates that PTG threatened to hold up the sale of Presidential's assets to LLC unless it was "compensated on an equitable basis for the existing notes [it held] against Presidential." R.19, Ex.G. LLC subsequently paid PTG $500,000 in connection with the asset sale for a note that essentially was uncollectible in light of Presidential's impending bankruptcy. Moreover, for the same reason that applying $750,000 of debt forbearance towards the purchase price for the assets added no real value to the consideration Presidential received, ownership of the note provided no real value to LLC. Contrary to PTG's argument, then, it is possible that the note purchase was not just a substitution of creditors; instead, the note purchase may have allowed LLC to eliminate Presidential's debt to PTG by paying PTG $500,000 it otherwise would not have received. In this procedural context and on this record, this possibility is sufficient to satisfy the trustee's burden of demonstrating that the transfer was made for or on account of an antecedent debt. Therefore, PTG is not entitled to summary judgment on this ground.

Conclusion

Based on this record, the trustee has demonstrated that LLC's $500,000 payment to PTG in connection with the asset sale may have been a transfer of an interest of Presidential in property that was made for or on account of an antecedent debt. The district court's entry of summary judgment in favor of PTG is reversed, and this case is remanded for further proceedings consistent with this opinion.

REVERSED and REMANDED

FOOTNOTES

/1 The facts on which we rely are taken from the affidavits the parties submitted in support of their motions for summary judgment, along with various documents that the parties stipulated would be admissible into evidence.

/2 The record also contains a copy of handwritten notes relating to the APA taken by a representative of PTG, although the record does not reveal when or in what context the notes were taken. The PTG representative wrote the following in his notes:

Owners of buying entity
Getting $3.5 mm for the assets
to bank & to JV
o to us!

R.19, Ex.I.

The notes appear to have been taken April 15, 1999, the same day PTG sent its initial letter to LLC and Monument. The note-taker initialed the notes and wrote "4/15/99" under his initials. Id. However, "5/99" also is written on the notes. Id. The asset sale between Presidential and LLC took place on May 5, 1999, and we presume the "5/99" notation relates to that transaction. However, the parties have provided no indication of when, where, or why the notes were taken, so our conclusion as to the date the notes were taken must be somewhat speculative.

/3 Weingardt's affidavit also states that LLC's $500,000 payment to PTG did not reduce the amount LLC paid to Presidential for its assets.

/4 At oral argument, the trustee informed us that the amount of Presidential's secured debt was approximately $3.4 million.

/5 LLC assumed only two of Presidential's liabilities. The first liability LLC assumed was the book value of a $443,000 trade account payable to Extruded Metals, Inc. The closing cash statement reflects that Extruded Metals received only $157,000 on closing day. The second liability LLC assumed was current and ordinary business expenses not yet paid and properly accrued as of

the closing date.

/6 According to PTG's appellate brief, the trustee has filed suit elsewhere to recover this $750,000 as a preference.

/7 Presidential's working capital was defined as the sum of its inventory plus its accounts receivable, less the value of the Extruded Metals trade account, less business expenses.

/8 This $37,000 payment to Weingardt appears to represent consideration for a non-compete agreement, as the closing cash statement includes the notation "Non-Compete" under the amount of cash that was wired. R.19, Ex.F.

/9 According to PTG's attorney at oral argument, Presidential actually ended up owing LLC money after all the adjustments were made. Following the closing, Presidential was supposed to try to collect its accounts receivable. If any accounts remained outstanding at the end of the collection period, LLC had the right to make Presidential buy those accounts back. Put simply, Presidential had to pay LLC for the accounts it could not collect. If the shortage in the working capital and the amount of the outstanding accounts exceeded the PCP ($585,000), no PCP would be made and Presidential would have to pay LLC for the remaining shortage.

/10 This provision of the Bankruptcy Code probably should be numbered sec. 101(58). See 11 U.S.C. sec. 101 n.8. Due to a numbering error, it is the second of two provisions labeled sec. 101(54).

/11 We have recognized in the past that diminution of the debtor's estate is not an element of the preference statute. See In re Smith, 966 F.2d 1527, 1536 n.13 (7th Cir. 1992). However, we also have recognized that "the 'diminished estate' element of a preferential transfer is consistently applied," and we previously have refused to disturb its application. Id. In keeping with our prior precedent and that of other circuits, we continue to consider whether the transfer in question diminished the debtor's estate.

/12 We note in passing that, under the APA, LLC effectively assumed the debt

Presidential owed to Extruded Metals. However, neither party has argued that this payment is a preference, and we therefore express no opinion on the matter.

/13 The assets Presidential retained were its cash, corporate books and records, benefit plans, certain contracts, and tax refunds.

/14 See supra note 13 and accompanying text.