**In the Matter of Mark Edward LEWINSKI, Debtor.**

**Jacqueline Sells Homann, Trustee, Plaintiff,**

**v.**

**R.I.H. Acquisitions In, LLC d/b/a Resorts East Chicago, Defendant.**

**Bankruptcy No. 05–34537 HCD. Adversary No. 07–3082.**

United States Bankruptcy Court, N.D. Indiana, South Bend Division.

Sept. 30, 2008.

Jacqueline S. Homann, South Bend, IN, and Ben T. Caughey, Esq., Ice Miller, Indianapolis, IN, Trustee.

## MEMORANDUM OF DECISION

HARRY C. DEES, JR., Chief Bankruptcy Judge.

At South Bend, Indiana, on September 30, 2008.

Before the court in this adversary proceeding is the "Complaint to Avoid and Recover an Avoidable Transfer" filed by Jacqueline Sells Homann, chapter 7 Trustee of the bankruptcy estate of debtor Mark E. Lewinski. She seeks to avoid and recover a preferential transfer made by the debtor to the casino R.I.H. Acquisitions IN, LLC, doing business as Resorts East Chicago ("Resorts" or "casino"). After the defendant answered the Complaint and asserted affirmative defenses, the court held a pre-trial conference. The parties then filed a joint stipulation of facts and simultaneous briefs and responses. The matter was taken under advisement on June 17, 2008. For the reasons articulated below, the court finds that the transfers at issue are preferential transfers that are avoidable and recoverable by the Trustee pursuant to 11 U.S.C. §§ 547 and 550.

### Jurisdiction

Pursuant to 28 U.S.C. § 157(a) and Northern District of Indiana Local Rule 200. 1, the United States District Court for the Northern District of Indiana has referred this case to this court for hearing and determination. After reviewing the record, the court determines that the matter before it is a core proceeding within

the meaning of § 157(b)(2)(F) over which the court has jurisdiction pursuant to 28 U.S.C. §§ 157(b)(1) and 1334. This entry shall serve as findings of fact and conclusions of law as required by Federal Rule of Civil Procedure 52, made applicable in this proceeding by Federal Rules of Bankruptcy Procedure 7052 and 9014. Any conclusion of law more properly classified as a factual finding shall be deemed a fact, and any finding of fact more properly classified as a legal conclusion shall be deemed a conclusion of law.

## Background

The following facts have been stipulated by the parties. When the debtor filed a voluntary chapter 7 petition on August 16, 2005, Ms. Homann was appointed the Trustee of the debtor's bankruptcy estate. Resorts, a limited liability company registered to do business in Indiana, operates a casino, hotel, and entertainment facility in East Chicago, Indiana. The debtor patronized Resorts on numerous occasions during the calendar year 2005 by engaging in gaming activities at Resorts' casino. He executed a Casino Credit Cashing Application with Resorts on April 11, 2005; when approved, it allowed the debtor to obtain credit from Resorts by signing markers. The parties described a marker as essentially a counter-check that is tendered to a casino in exchange for gambling chips, which then are used in the casino to place wagers. According to the parties, when a patron satisfies a marker, the marker is returned to him. When a patron fails to satisfy a marker at the end of a gambling session, Resorts' policy, consistent with the policy in the industry, is to hold the marker for 28 days. If the marker is not satisfied during that time, Resorts deposits the marker at the patron's bank for payment.

On April 14, 2005, the debtor signed a marker for $25,000 but did not satisfy the marker within the 28–day period. When Resorts deposited it in the debtor's bank, the marker was returned for insufficient funds. On July 12, 2005, the debtor satisfied the marker by paying Resorts with a $25,000 personal check. The satisfaction of that marker by check was a cash payment to Resorts during the 90 days preceding his chapter 7 filing.

On July 15, 2005, the debtor took out four markers in the total amount of $150,000. In exchange, the debtor received $150,000 in gambling chips from Resorts. On August 4, 2005, the debtor paid $50,000 in gambling chips to Resorts in exchange for one of those markers, Marker Number 54401104. The other three markers remained unpaid. Resorts holds an unsecured claim against the debtor's estate for the $100,000 debt.

In her Complaint, the Trustee contended that the debtor paid $75,000 to Resorts during the 90 days prior to bankruptcy and that the payment constituted a preference that is avoidable by the Trustee pursuant to § 547 and § 550 of the Bankruptcy Code. In her brief, the Trustee specified that she sought to avoid and recover two transfers by the debtor to Resorts: the July 12, 2005 transfer of a $25,000 personal check to pay for a $25,000 marker ("the check payment"), and the August 4, 2005 transfer of $50,000 in gambling chips to pay for a $50,000 marker ("the chips payment"). In its Answer, the casino denied that it had received avoidable transfers and raised numerous affirmative defenses. The stipulated facts, briefs and record are now before the court.

## Discussion

■ "A transfer of an interest of the debtor in property is preferential, and therefore avoidable, if it (1) was made to or for the benefit of a creditor, (2) was for or on account of an antecedent debt, (3) was made while the debtor was insolvent, (4)

was made on or within 90 days before the date of the filing of the petition, and (5) allowed the creditor to receive more than it otherwise would have." [1] *Warsco v. Preferred Tech. Group*, 258 F.3d 557, 564 (7th Cir.2001) (citing 11 U.S.C. § 547(b) ). "However, '[n]ot all transfers that meet § 547(b)'s criteria are avoidable. Section 547(c) provides six exceptions to the avoidable preference provision.' " [2] *In re ABC–Naco, Inc.*, 483 F.3d 470, 472 (7th Cir.2007) (quoting *Energy Coop., Inc. v. SOCAP Int'l, Ltd. (In re Energy Coop., Inc.)*, 832 F.2d 997, 1000 (7th Cir.1987)). The trustee bears the burden of proving the avoidability elements of § 547(b), and the creditor has the burden of proving the nonavoidability elements of § 547(c). *See* 11 U.S.C. § 547(g); *see also Boberschmidt v. Society Nat'l Bank (In re Jones)*, 226 F.3d 917, 921 (7th Cir.2000); *Barber v. Golden Seed Co., Inc.*, 129 F.3d 382, 390 (7th Cir.1997). Through their Stipulation, the parties agreed and the evidence establishes that the Trustee has satisfied all five of the elements listed in § 547(b) with respect to the check payment, and that she has satisfied paragraphs (1), (3), (4)(A),

and (5) of § 547(b) with respect to the chips payment. To demonstrate the "antecedent debt" requirement of paragraph (2), the Trustee has the burden of proving that the transfer of $50,000 in gambling chips to pay off Marker Number 54401104 was a transfer of an interest of the debtor in property for or on account of an antecedent debt.

### A. *Avoidance of the Chips Payment Transfer as a Preferential Transfer Under § 547(b)(2)*

■ The Trustee claimed that the August 4, 2005 payment of the $50,000 marker with gambling chips was a transfer made on account of an antecedent debt. She explained that the debt was created on July 15, 2005, when the debtor's marker was tendered to the casino, because the obligation to repay the marker was created at that time. *See* R. 27 at 4 (citing *Jones Truck Lines, Inc. v. Central States, Southeast & Southwest Areas Pension Fund (In re Jones Truck Lines, Inc.)*, 130 F.3d 323, 329 (8th Cir.1997)). Because the repayment of the marker was made three weeks

---

**1.** Section § 547(b) provides: ... [T]he trustee may avoid any transfer of an interest of the debtor in property—

   (1) to or for the benefit of a creditor;

   (2) for or on account of an antecedent debt owed by the debtor before such transfer was made;

   (3) made while the debtor was insolvent;

   (4) made—

    (A) on or within 90 days before the date of the filing of the petition; ... and

   (5) that enables such creditor to receive more than such creditor would receive if—

    (A) the case were a case under chapter 7 of this title;

    (B) the transfer had not been made; and

    (C) such creditor received payment of such debt to the extent provided by the provisions of this title.

**2.** Section 547(c) provides, in relevant part: The trustee may not avoid under this section a transfer—

   (1) to the extent that such transfer was—

    (A) intended by the debtor and the creditor to or for whose benefit such transfer was made to be a contemporaneous exchange for new value given to the debtor; and

    (B) in fact a substantially contemporaneous exchange;

   . . .

   (4) to or for the benefit of the creditor, to the extent that, after such transfer, such creditor gave new value to or for the benefit of the debtor—

    (A) not secured by an otherwise unavoidable security interest; and

    (B) on account of which new value the debtor did not make an otherwise unavoidable transfer to or for the benefit of such creditor.

later, she insisted that it was payment on an antecedent debt. *See id.* (citing *Warsco,* 258 F.3d at 569). All other elements of § 547(b) were met, the Trustee said, and therefore the amount paid on August 4, 2005, to Resorts by the debtor with chips was a preferential transfer.

Resorts challenged the Trustee's position under § 547(b)(2) with two arguments. It first asserted that the debtor's payment of $50,000 in gambling chips to pay off the marker could not be avoided because the transfer of chips was not a transfer of "an interest of the debtor in property." It defined two terms: Markers are essentially counter-checks tendered to Resorts in exchange for gambling chips, and gambling chips are placeholders used in Resorts' casino to place wagers. *See* R. 26 at 6. Resorts further defined a "counter-check" as " 'a bank check for the use of customers making a withdrawal.' " R. 26 at 12 n. 22 (citing American Heritage College Dictionary (4th ed.2000)). Based on these definitions, it insisted that gambling chips were not property of the debtor: They had no economic value outside the casino, did not constitute currency, and could not be used to satisfy the claims of the debtor's creditors. Rather, they were an accounting mechanism and placeholder to evidence a debt owed by Resorts. R. 26 at 6–10 (relying primarily upon *Zarin v. Comm'r,* 916 F.2d 110, 114 (3d Cir.1990)). Resorts also relied upon Indiana law to provide guidance about "the legal nature and value of gaming chips." R. 26 at 8. Resorts pointed out that "Indiana law provides that gambling chips may not be used as currency" and therefore that "the Trustee could not legally do anything with $50,000 of Resorts' gaming chips." R. 26 at 8, 9. The Trustee did not dispute that

the round plastic chips themselves were not property of the debtor. She pointed out, however, the defendant's statement that the chips "evidence a debt owed by Resorts" and argued that it is the debt, evidenced by the chips, that is the property of the debtor. *See* R. 31 at 2.

■■■ A transfer is preferential only "if what was transferred constituted an interest of the debtor in property." *Warsco,* 258 F.3d at 564. In *Warsco,* the Seventh Circuit Court of Appeals noted the expansiveness of the definition of "transfer" under the Bankruptcy Code and concentrated on whether a payment by the debtor to a creditor was "an interest of the debtor in property."[3] *Id.* (citing *Barnhill v. Johnson,* 503 U.S. 393, 400, 112 S.Ct. 1386, 118 L.Ed.2d 39 (1992)). It set forth the fundamental inquiry:

> "[P]roperty of the debtor subject to the preferential transfer provision is best understood as that property that would have been part of the estate had it not been transferred before the commencement of bankruptcy proceedings. Courts considering this element of the preference provision have focused on whether the transfer diminished the debtor's estate.

*Id.* (citations omitted). According to *Warsco,* a transfer of a $50,000 payment from the debtor to a creditor within the 90–day preference period usually is considered a transfer of something of value to a particular creditor and is considered avoidable by a trustee. *See id.* In this case, the casino focused on the transfer of a $50,000 payment in gambling chips to satisfy its $50,000 marker. It asserted that the chips, which it called placeholders or accounting mechanisms without value outside

---

**3.** The Bankruptcy Code's definition of "transfer" includes "each mode, direct or indirect, absolute or conditional, voluntary or involuntary, of disposing of or parting with—(i) property; or (ii) an interest in property." 11 U.S.C. § 101(54)(D).

the casino, were not property of the debtor subject to preferential transfer.

The court finds that Resorts creatively attempted to divert the court's attention from the underlying negotiated transaction to the wagering process, which required gambling chips. The undisputed facts of this case reflected the essence of any transaction between a patron and a casino. The patron went to the casino to gamble and to win money. The casino was willing to lend him money on a contractual basis. The patron first was required to execute the casino's credit application to prove his credit-worthiness. Only after it was approved and he was extended credit up to a certain amount was he allowed to execute markers with which to purchase chips that entitled him to gamble.[4] By signing each marker, the patron agreed that he was obligated to repay the funds being loaned to him. Each marker indicated the amount of credit being loaned to him, and that amount was exchanged for gambling chips. The chips therefore had clear value in the casino; they were fungible tokens used as a substitute for the cash or credit amount the debtor brought into the casino, and at the end of play they could be cashed in or used to redeem a marker. *See, e.g.*, R. 22, ¶ 11 (stipulation that the debtor "tendered $50,000 in gaming chips to Resorts on August 4, 2005 in exchange for Marker Number 54401104"). However, if the marker was not paid back in the full amount—with cash, checks, chips, or another approved mode of exchange—

within 28 days, it was the casino's policy to deposit the marker at the patron's bank for payment.[5] In this case, the debtor paid back one marker at issue with a personal check and the other marker with gambling chips. Each payment method was accepted by Resorts, and each marker was considered paid in full. In essence, then, each marker established a straightforward short-term loan transaction between the casino and the debtor, and the chips exchanged for the marker reflected the same value amount as the marker but were used specifically to gamble in the casino.

This court finds persuasive the analysis provided by the Eighth Circuit in *Harrah's Tunica Corp. v. Meeks (In re Armstrong)*, 291 F.3d 517 (8th Cir.2002).

> When Harrah's extended a line of credit to [the debtor] Armstrong, permitted him to sign markers in exchange for chips, and promise not to present the markers to his bank for payment for a definite length of time, Harrah's made a short term loan to Armstrong.

*Id.* at 523. In the view of the court, therefore, Resorts' attempt to recharacterize the transaction is unpersuasive and its argument that the transfer of $50,000 in chips was not avoidable under § 547(b) was unsuccessful. Following Warsco's analysis, the court finds that the debtor's $50,000 payment in chips to redeem Resorts' $50,000 marker was a transfer of property that would have been part of the

---

4. Casinos may investigate the credit status of a patron through traditional credit-reporting sources and through a Central Credit service designed particularly for casinos. That service reports the amounts of credit available to the patron in other gambling establishments, his balances in each, and basic information concerning his history of gambling play. *See* Patrick E. Ogle, *"In re Armstrong: Gambling with Other People's Money,"* 56 Ark. L.Rev. 455, 459 (2003).

5. It has been said that "[t]he marker has greater prospects for collection than non-gambling credit simply because the casino has the threat of cutting off the gambler if the marker is not paid." Richard I. Aaron, *"Gambling Markers and Bankruptcy,"* 2004 Ann. Survey of Bankr.Law Part I § D (2004).

debtor's bankruptcy estate had it not been transferred within the 90–day preference period. It further determines that the transfer diminished the debtor's estate. Therefore, the chips payment transfer is a preferential transfer that is avoidable by the Trustee.

The casino's reliance on the laws of Indiana to demonstrate that gambling chips may not be used as currency was also ill conceived. Indiana has had a long history of prohibiting gambling, but has carved out a few well-regulated exceptions. *See Schrenger v. Caesars Indiana*, 825 N.E.2d 879, 882 (Ind.App.2005) (reviewing the gambling laws of Indiana). One "specific, later-enacted exception to the general rule that gambling debts are void as against public policy" is found in Indiana Code 4–33–9–15.[6] *Id.* at 883. That section authorizes riverboat casinos operators to extend credit to patrons for the specific purpose of gambling. *See id.* In fact, the provisions throughout Chapter 9, entitled "Gambling Operations," set up tight controls on gambling. For example, there are regulations limiting the length of time of a riverboat gambling cruise, *see* Ind.Code 4–33–9–3, and the forms of wagering permitted on gambling games, *see* Ind.Code 4–33–9–9. To the same purpose, the limitation of subsection 15—requiring that chips be purchased only from the owner or agent of the riverboat—is simply another restraint or control on gambling activities. Subsection 15 also makes clear that tokens, chips, and electronic cards are the acceptable non-monetary substitutes that are available for making wagers on the riverboat and that they may be purchased by means of a credit agreement. The provision does not suggest in any way that gambling chips may not be used as currency, as Resorts asserts.

Resorts' reliance on a Third Circuit tax case, *Zarin v. Comm'r*, 916 F.2d 110 (3rd Cir.1990), was unhelpful to the casino in this bankruptcy context. *Zarin* found that gambling chips "are merely an accounting mechanism to evidence debt" and "not the property of [the taxpayer Zarin]." *Id.* at 113, 114. However, the case arose under the Internal Revenue Code, not the Bankruptcy Code. It concerned the issue of recognized income after a settlement of gambling debts, and it focused on the tax code's definition of gross income under § 108 of the Internal Revenue Code. The court finds the discussion of gambling chips in *Zarin* to be inapposite to the case before it.

■ Resorts presented a second argument to show that the chips transfer, pursuant to § 547(b)(2), was not a "transfer made on account of an antecedent debt." It reported that the debtor had satisfied the marker within the 28–day period during which Resorts was holding the marker. The casino then concluded (without citation to supporting cases) that, because the debtor "took advantage of that opportunity" to exchange the gambling chips within the 28 days, "there was no satisfaction of an antecedent debt under § 547(b)(2)." R. 26 at 11.

■ The term "antecedent debt" is not defined in the Bankruptcy Code. A

---

**6.** Indiana Code 4–33–9–15 provides as follows:

(a) All tokens, chips, or electronic cards that are used to make wagers must be purchased from the owner or operating agent of the riverboat:

(1) while on board the riverboat; or

(2) at an on-short facility that:

(A) has been approved by the commission; and

(B) is located where the riverboat docks.

(b) The tokens, chips, or electronic cards may be purchased by means of an agreement under which the owner or operating agent extends credit to the patron.

"debt" is defined as a "liability on a claim," *see* § 101(12), and a "claim" means a "right to payment," *see* § 101(5(A)). A debt is considered to be antecedent, for purposes of § 547(b), "if it was incurred before the allegedly preferential transfer." *In re Bridge Info. Sys., Inc.*, 474 F.3d 1063, 1066–67 (8th Cir.2007) (citation omitted). "An antecedent debt exists when a creditor has a claim against the debtor, even if the claim is unliquidated, unfixed, or contingent." *Warsco*, 258 F.3d at 569 (citing *Energy Coop., Inc. v. SOCAP Int'l, Ltd. (In re Energy Coop. Inc.)*, 832 F.2d 997, 1001 (7th Cir.1987)). Courts interpreting § 547 generally hold that a debt is incurred on "the date upon which the debtor first becomes legally bound to pay." *In re Bridge Info. Sys., Inc.*, 474 F.3d at 1067 (citation omitted); *see also* 5 Collier on Bankruptcy ¶ 547.03[4] at 547–35,–36 (Alan N. Resnick & Henry J. Sommer, eds., 15th ed. rev'd 2008) (citing cases).

Because the debtor created a debt owed to Resorts that he was legally bound to pay when he signed Resorts' $50,000 marker on July 15, 2005, the court finds that the debtor's payment of the $50,000 marker on August 4, 2005, with gambling chips was a payment for or on account of an antecedent debt owed by the debtor on July 15, 2008. *See In re Armstrong*, 291 F.3d at 524 ("Because the debt here was incurred thirty days before payment, we find the payment of the casino markers constituted the payment of antecedent debt for purposes of 11 U.S.C. § 547(b).") (citing *Jones Truck Lines, Inc.*, 130 F.3d at 329). The court concludes that the transfer on August 4, 2005, constituted an avoidable preference.

B. *Nonavoidability of Chips Payment Transfer Pursuant to § 547(c)(1)*

Resorts argued that the gambling chips payment was a "contemporaneous exchange for new value" under § 547(c)(1) and therefore not avoidable by the Trustee. In its view, there was a simultaneous exchange of the debtor's tendering of $50,000 in gambling chips to Resorts and Resorts' tendering of Marker Number 54401104 to the debtor. It asserted that "the simultaneous exchange of a negotiable instrument (the marker) for gaming chips is a contemporaneous exchange for new value protected from avoidance by Section 547(c)(1)." R. 26 at 11. The "new value," Resorts pointed out, was the debtor's receipt of the marker, which was a negotiable instrument, in return for his tendering $50,000 of gambling chips.

Under § 547(c)(1), the trustee may not avoid a transfer if that transfer was intended, by both the debtor and the creditor for whose benefit the transfer was made, "to be a contemporaneous exchange for new value given to the debtor." The term "new value" is defined in subsection (a) of the preference provision:

In this section "new value" means money or money's worth in goods, services, or new credit, or release by a transferee of property previously transferred to such transferee in a transaction that is neither void nor voidable by the debtor or the trustee under any applicable law, including proceeds of such property but does not include an obligation substituted for an existing obligation.

11 U.S.C. § 547(a)(2). To receive the protection of § 547(c)(1), Resorts has the burden of establishing its elements: that both parties intended a contemporaneous exchange, that the exchange was in fact contemporaneous, and that the exchange was for new value. *See In re Armstrong*, 291 F.3d at 525. The theory underlying this exception to avoidance is that, "to the extent new value is offered, the preference is repaid to the estate." *In re Prescott*, 805 F.2d 719, 727 (7th Cir.1986). However, the creditor must give evidence of the

parties' intent that the transaction be substantially contemporaneous. *See id.* (concluding that creditor failed to give any evidence of intent). In this case, Resorts and the debtor agreed, when the debtor signed the marker on July 14, 2005, that the loan would not become due and that the casino would not cash the marker for 28 days. That agreement reflects that the parties did not intend a contemporaneous exchange for new value. *See In re Armstrong,* 291 F.3d at 525.

The creditor must also show that new value was given. *See In re Energy Coop., Inc.,* 832 F.2d. at 1003 (concluding that debtor's receipt of a release and good will did not fall within the § 547(a)(2) definition of new value). In this case the debtor paid off the marker, thereby paying off his obligation to Resorts on that marker. His receipt of the marker when he paid the debt is not "money or money's worth in goods, services, or new credit." The court finds that the return of the marker to the debtor does not fall within § 547(a)(2)'s definition and does not reflect any new value to the debtor.[7]

■ "The purpose of the contemporaneous exchange exception, like that of other section 547(c) exceptions, is to encourage creditors to continue to deal with troubled debtors without fear that they will have to disgorge payments received for value given." 5 Collier on Bankruptcy ¶ 547.04[1] at 547–49; *see also In re Jones Truck Lines, Inc.,* 130 F.3d at 326 ("Section 547 is intended to discourage creditors from racing to dismember a debtor sliding into bankruptcy and to promote equality of distribution to creditors in

bankruptcy."). The Eighth Circuit, in *In re Armstrong,* commented that such policy considerations are not met "by encouraging casinos to issue credit to troubled debtors so they may, with the odds against them, gamble away their remaining assets and increase their debt." 291 F.3d at 525.

The court finds that Resorts has not met its burden of proving an exception to avoidability by showing that the chips payment transfer was a contemporaneous exchange for new value pursuant to § 547(c)(1). Because the Trustee successfully met her burden of proving that the debtor's payment of the Resorts $50,000 marker with $50,000 worth of gambling chips constituted a transfer of an interest of the debtor in property for or on account of an antecedent debt owed by the debtor before such transfer was made for purposes of 11 U.S.C. § 547(b)(2), she may avoid that preferential transfer and recover the value of that transfer, $50,000, from Resorts for the benefit of the debtor's bankruptcy estate pursuant to 11 U.S.C. § 550.[8]

### C. *Nonavoidability of Check Payment Transfer pursuant to § 547(c)(1) and (c)(4)*

■ Resorts stipulated that the § 547(b) elements of a preferential transfer were proven concerning the $25,000 check payment. However, it insisted that the same arguments that protected the chips payment transfer as a contemporaneous exchange for new value likewise protected the check payment. It argued that the debtor tendered a personal check for

---

7. The court finds both the casino's "lawn mower" scenario and the Trustee's fictitious "opera tickets" analogy unhelpful and declines to address those theories. *See* R. 26 at 13; R. 27 at 8.

8. Section 550 of the Bankruptcy Code provides that, "to the extent that a transfer is avoided under section ... 547 ..., the trustee may recover, for the benefit of the estate, the property transferred or, if the court so orders, the value of such property, from (1) the initial transferee of such entity."

$25,000 to Resorts in satisfaction of a $25,000 marker, an exchange of one negotiable instrument for another. In addition, Resorts claimed, in return for the check transfer the debtor received an equivalent value in the form of the release of the marker. The court finds that the casino again failed to provide any authority to support its argument. It did not demonstrate that a debt incurred on April 14, 2005 (when the marker was signed) and discharged on July 12, 2005 (when the check was tendered to Resorts) was a contemporaneous exchange. It did not show any new value to the debtor for the exchange. The return of the marker does not constitute new value, as the court previously concluded. The casino failed in its burden of proving the elements of § 547(c)(1) to insulate the check payment transfer from avoidance.

■ Resorts proffered a final argument arising from the other "new value" defense found in § 547(c)(4). This argument had, as its premise, that the court found that gambling chips constituted property of the debtor. The casino claimed: "To the extent that gaming chips constitute property of the Debtor (not merely an accounting mechanism and evidence of indebtedness as established by Resorts in Section I), the $100,000 in gaming chips [that were tendered to the debtor in exchange for three markers that were not satisfied and that remain unpaid] constitute subsequent new value that protect the Check Transfer." R. 26 at 14. Because the court made no finding that gambling chips were (or were not) property of the debtor, the argument fails for lack of a correct premise. Moreover, it was an improperly developed argument unsupported by any case law. The court reminds the casino that this exception, like the others in § 547(c), is meant to help creditors continue to work with financially risky debtors; it is not meant to allow casinos to encourage troubled debtors to continue gambling. See In re Armstrong, 291 F.3d at 525–26; see also McKloskey v. Schabel (In re Schabel), 338 B.R. 376, 380 (Bankr. E.D.Wis.2005) (explaining the intent of Congress "to encourage creditors to continue doing business with troubled debtors by protecting transfers received by creditors from preference actions, to the extent that the creditors provided goods that replenished the estate during the preference period").

■ In any case, the casino's position is without merit. Under the § 547(c)(4) exception, a preferential transfer is not avoidable to the extent that the transferee (Resorts) gives new value to the debtor after the transfer on an unsecured basis. See In re Prescott, 805 F.2d at 728. Resorts failed to demonstrate that the gambling chips received in exchange for the three unsatisfied markers provided new value to the debtor. If new value had been provided, the casino did not show that it was provided to the debtor after the preferential transfer. See In re Schabel, 338 B.R. at 380. The debtor obtained four markers on July 15, 2005, and redeemed one of those markers on August 4, 2005, the date of the preferential transfer. There is no evidence that the three unpaid markers constituted an extension of new value provided by Resorts to the debtor after that transfer. Resorts' proof of claim, seeking repayment for the outstanding $100,000 debt on those markers, indicates that the creditor did not intend to replenish the debtor's estate. Resorts is simply a creditor that received a payment from the debtor on a pre-existing obligation, as evidenced by the $50,000 marker, during the preference period. See Gouveia v. RDI Group (In re Globe Bldg. Materials, Inc.), 484 F.3d 946, 951 (7th Cir.2007) (affirming preferential transfer).

The fact that other markers were not paid does not create new value.

In conclusion, the court finds that Resorts has not established a defense under § 547(c) to the Trustee's right to avoid preferential transfers. It determines that the Trustee is entitled to avoid and to recover the two payments the debtor made to Resorts during the preference period, one with a check and the other with $50,000 worth of gambling chips. The Trustee's request for interest, as provided under the Bankruptcy Code, without objection from Resorts, is also granted. *See Feltman v. City Nat'l Bank (In re Sophisticated Communications, Inc.,* 2007 WL 3216613 at *8 (Bankr.S.D.Fla.2007) (unpub'd).

## CONCLUSION

For the reasons presented above, the court grants judgment plus interest, pursuant to 11 U.S.C. §§ 547(b) and 550, in favor of the Trustee Jacqueline Sells Homann and against the defendant R.I.H. Acquisitions IN, LLC d/b/a Resorts East Chicago on the Trustee's Complaint to Avoid and Recover an Avoidable Transfer.

SO ORDERED.