JETZ SERVICE COMPANY,
INC., Respondent,

v.

Zarif BOTROS and Judi Botros,
Respondents Pro Se,

and

Coinmach Corporation, Appellant.

No. WD 61155.

Missouri Court of Appeals,
Western District.

Dec. 10, 2002.

Stephen G. Mirakian, Kansas City, MO, for Appellant.

Robert B. Best, Jr., Kansas City, MO, for Respondent Jetz.

Zarif Botros and Judi Botros, Topeka, KS, Respondents pro se.

Before PAUL M. SPINDEN, P.J., PATRICIA A. BRECKENRIDGE and THOMAS H. NEWTON, JJ.

THOMAS H. NEWTON, Judge.

Coinmach Corporation appeals from the judgment of the trial court, ruling in favor of respondent Jetz Service Company, Inc. on its petition to quiet title or for declaratory judgment and in favor of respondents Zarif and Judi Botros on Coinmach's cross-claim against them for breach of contract. For the reasons explained below, we affirm in part and reverse in part.

## I. Factual and Procedural Background

Appellant Coinmach and respondent Jetz are competitors in the coin-operated laundry machine business. This appeal stems from their dispute over the right to operate laundry room facilities at Cobblestone Apartments in Kansas City, Missouri. Coinmach operated those facilities under a 1993 lease (the Macke lease) originally negotiated between Coinmach's predecessor, Macke Laundry Service Limited Partnership, and Cobblestone's former landlords, respondents Zarif and Judi Botros. After Coinmach acquired Macke in April 1998, Coinmach assumed Macke's tenancy under the Macke lease, without apparent objection from Mr. Botros. Mr. Botros accepted Coinmach's payment of rent and performance of obligations under the Macke lease.

At the expiration of its original five-year term in September 1998, the Macke lease automatically renewed for another five years according to its terms. While the lease allowed the tenant to terminate the lease before automatic renewal by giving the landlord sixty-days notice of its intent to terminate, the lease did not give the landlord a corresponding right.[1] The lease only allowed the landlord to terminate the lease upon completion of the second five-year term.[2]

Contrary to the automatic renewal provision, Mr. Botros evidently believed that the Macke lease allowed him to terminate the lease at the end of the first five-year term. In July 1998, he sent a letter to Coinmach invoking the automatic renewal provision and notifying Coinmach that he would not renew at the end of the first term. Around the same time, Mr. Botros contacted Jetz about operating the Cobblestone laundry room. Jetz submitted multiple proposals. In October 1998, Botros and Jetz agreed on the terms for a proposed lease (the Jetz proposal).

The Jetz proposal contained a cancellation clause allowing the landlord to terminate the lease without cause during its first six months of operation. The cancellation clause required the landlord to give thirty-days notice of termination and to refund a prorated portion of a decorating allowance.

The parties disagree about the negotiations that ensued between Coinmach and Mr. Botros following Mr. Botros' an-

---

[1]. Paragraph 14 of the Macke lease says: "This lease shall be automatically renewed successive [sic] similar terms unless Lessee gives notice by Certified Mail of its intention not to renew 60 days prior to the end of the initial term or any renewal term of this Lease."

[2]. Paragraph 14 of the Macke lease further says: "At the end of the additional [i.e., second] term this lease shall automatically renew for like successive terms, unless either party terminates this lease 60 days prior to the end of the lease, or any renewal term."

nouncement that he would not renew the Macke lease. Coinmach's vice president claims that she called Mr. Botros after receiving his July 1998 letter, and told him that he had no right to prevent automatic renewal of the lease for a second term. She also claims that Mr. Botros requested new equipment and some front money; she agreed to entertain any proposals that he might make.

Mr. Botros, on the other hand, denies that anyone from Coinmach ever informed him that he could not terminate the lease. He claims that Coinmach's vice president told him only that Coinmach had a right of first refusal under the Macke lease, allowing Coinmach to match any competitor's proposal.[3]

Consistent with his understanding that Coinmach had such a right, Mr. Botros forwarded the Jetz proposal to Coinmach. After Coinmach received the Jetz proposal, Coinmach's vice president spoke with Mr. Botros again. While denying that Coinmach had any obligation to match the Jetz proposal following automatic renewal of the Macke lease, she proposed to resolve the dispute by agreeing to enter a new lease (the Coinmach lease) on terms verbatim to those contained in the Jetz proposal, with one exception: she claims to have requested that the parties modify the proposed six-month cancellation clause to allow cancellation by the landlord during the first six months *only* if Coinmach failed to perform its obligations during

that time. She claims that Mr. Botros orally agreed to this modification.

From Mr. Botros' testimony, it is not clear whether he agreed to the requested modification during this conversation. At trial he testified that he didn't agree to any modification of the Coinmach lease cancellation clause. But during closing argument he said, "I just had it from Coinmach, and when I renewed the lease, I acted in a—I didn't understand the lease and I promise I will not ask them out if they perform, and to me performance the tenant will be satisfied and this didn't happen."

Following her conversation with Mr. Botros, Coinmach's vice-president signed the Coinmach lease containing the unmodified six-month cancellation clause[4] and then returned it to Mr. Botros for his signature. But she stapled to the lease a cover letter dated November 6, 1998, in which she wrote, "In regard to clause #18 [the six-month cancellation clause], I am assuming that you are including this clause as a protection on case of default by Lessee. Any attempt to use such a clause as a means to terminate a lease without cause could be considered a bad faith attempt to circumvent the Lessee's leasehold rights. This will not be an issue since we both are entering this lease in good faith."

Mr. Botros signed and returned the Coinmach lease, but did not respond to the stapled cover letter from Coinmach's vice president. On March 2, 1999, Mr. Botros

---

**3.** Paragraph 11 of the Macke lease says, in pertinent part: "At the expiration or termination of this Lease, if the Lessor desires to lease the laundry room to another person or entity to engage in the business of operating coin operated laundry equipment, the Lessee shall be granted the right to meet the terms of any bona fide offer for a proposed lease."

**4.** Paragraph 18 of the Coinmach lease says, "Lessor will have the right to cancel this lease for any reason by giving written notice via

Certified Mail to Lessee at the appropriate address specified herein, received at least thirty (30) days prior to the expiration of the first six (6) month period beginning on the date of the final installation of Lessee's laundry equipment, as specified below. In order to terminate this lease before the primary term is completed, Lessor must immediately refund the prorated Decorating Allowance to lessee, as specified in Item 17."

sent a letter to Coinmach's vice president, informing her that he was terminating the Coinmach lease and furnishing Coinmach with thirty-days' notice under the lease. Although the letter did not explain his reason for terminating the Coinmach lease, Mr. Botros has since claimed that Coinmach failed to perform its obligations adequately. The parties disagree whether the cancellation clause required Mr. Botros to refund to Coinmach the unused decorating allowance in this case; in any event, Mr. Botros did not tender that money with his March 2 letter.

After receiving the March 2 letter, Coinmach's vice president replied that Coinmach would not vacate the Cobblestone laundry room and that the parties had a "valid and binding agreement." Coinmach did not vacate the premises and Mr. Botros did not pursue the matter further. Coinmach continued to operate the Cobblestone laundry room and Mr. Botros continued to accept rent from Coinmach until he sold Cobblestone to a new owner in July 2000. To complicate matters, however, Mr. Botros signed a lease with Jetz in June 1999, giving Jetz the right to operate the Cobblestone laundry room. Jetz has been unable to take possession of the premises due to Coinmach's continued operation of the laundry room.

The parties tried the case to the circuit court. Without making findings of fact, the court entered judgment in favor of Jetz on its petition to quiet title or for declaratory judgment. The court entered judgment for landlords Zarif and Judi Botros on Coinmach's cross-claim for breach of contract. Coinmach now appeals.

Coinmach raises two points on appeal. In its first point, Coinmach contends that Mr. Botros never properly terminated the Coinmach lease. Coinmach reasons that Mr. Botros never properly terminated, either because he had no right to do so without cause or because he failed to comply with the cancellation clause requiring him to refund the prorated portion of the decorating allowance. In its second point, Coinmach contends that Mr. Botros breached the Coinmach lease by terminating the lease without good cause.

## II. Standard of Review

■ We review this court-tried case under the standard announced in *Murphy v. Carron*, 536 S.W.2d 30, 32 (Mo. banc 1976). We will affirm the trial court's judgment unless it is not supported by substantial evidence, it is against the weight of the evidence, or it erroneously declares or applies the law. *Id.*

## III. Legal Analysis

### A. Mr. Botros Did Not Properly Terminate the Coinmach Lease

■ Coinmach and Jetz initially agree that the Coinmach lease substituted for the old Macke lease. Since neither party disputes the validity of the substituted lease, we accept—without deciding—the premise that this substitution effectively extinguished the old Macke lease by process of novation. *See generally, State ex rel. Premier Mktg., Inc. v. Kramer*, 2 S.W.3d 118, 122 (Mo.App. W.D.1999) (discussing requirements for novation). The question before us is whether Mr. Botros properly terminated the substituted Coinmach lease. We conclude that he did not do so because he failed to refund the prorated decorating allowance, a condition precedent to proper termination of the lease. We begin with general principles relevant to our analysis of this condition precedent:

A condition precedent is a condition which must be fulfilled before the duty to perform an existing contract arises. Conditions precedent are disfavored and

contract provisions are construed as such only if unambiguous language so requires or they arise by necessary implication. However, a contract is not ambiguous merely because the parties disagree over its meaning. A condition precedent denotes an event, which qualifies a duty under an already enforceable contract.

*Lowery v. Air Support Int'l, Inc.*, 982 S.W.2d 326, 329 (Mo.App. S.D.1998) (citations omitted).

With these general principles in mind, we turn to the disputed cancellation clause. "A party must comply with conditions precedent imposed by the right to terminate a lease before that lease can be terminated." *Mo. Goodwill Indus., Inc. v. Johannsmeyer*, 901 S.W.2d 154, 156 (Mo. App. E.D.1995). "If the party has not complied with those conditions, the lease continues in force." *Id.* Strict compliance is required. *Id. See also* 17B C.J.S. *Contracts* § 444, p. 63 (1999) ("Unless otherwise regulated by statute, parties to an agreement may specify circumstances or conditions that empower a party to terminate a contract. Conditions precedent to contract termination must be strictly fulfilled and the grounds for termination must have accrued.").

The tender of money can be a condition precedent to proper termination if the cancellation clause so dictates. *See Nat'l Alfalfa Dehydrating & Milling Co. v. 4010 Washington, Inc.*, 434 S.W.2d 757 (Mo.App.1968). In *National Alfalfa*, the subject lease contained a cancellation clause requiring the tenant to pay a cancellation penalty "on or before the effective date of ... cancellation ...." *Id.* at 759. This court held that "the payment of the 6% cancellation penalty prior to the effective date of cancellation was a condition precedent to the right to cancel and [the tenant] did not make or tender such pay-

ment." *Id.* at 763–64. Because the tenant in *National Alfalfa* never paid the money, the tenant never effectively cancelled the lease and it remained in effect. *Id.* at 764. *See also* 2 MILTON R. FRIEDMAN, FRIEDMAN ON LEASES § 21.1, at 1310 (4th ed. 1997) ("When a cancellation premium is to be paid by landlord, tenant may seek to have payment of the premium made a condition precedent to the effectiveness of the notice, whereas landlord may insist that his liability for payment not become due until tenant has vacated and surrendered possession of the leased premises in the condition required by the lease.").

In this case, the Coinmach lease cancellation clause reads:

18. Termination. Lessor will have the right to cancel this lease for any reason by giving written notice via Certified Mail to Lessee at the appropriate address specified herein, received at least thirty (30) days prior to the expiration of the first six (6) month period beginning on the date of the final installation of Lessee's laundry equipment, as specified below. *In order to terminate this lease before the primary term is completed, Lessor must immediately refund the prorated Decorating Allowance to Lessee,* as specified in Item # 17.

(emphasis added). Although not identical to the cancellation clause in *National Alfalfa*, this clause is just as unambiguous. The prefatory phrase "in order to terminate" leaves no doubt that termination does not occur until the landlord first refunds the prorated decorating allowance. It is a condition precedent to effective termination. We disagree with Jetz that the word "immediately" denotes an option to refund the prorated decorating allowance immediately *after* the tenant vacates the premises. Nowhere does the cancellation clause make payment contingent upon

the tenant vacating the premises, as it might have if the parties had wanted it that way.

 Because Mr. Botros never refunded the money to Coinmach, as required by the unambiguous terms of the cancellation clause, he never properly terminated the lease. And a " 'cancellation notice that fails to comply with its requirements may be disregarded by its recipient as a nullity.' " *Johannsmeyer*, 901 S.W.2d at 156 (quoting 2 MILTON R. FRIEDMAN, FRIEDMAN ON LEASES § 21.4, at 1209 (3d ed.1990)). That being so, the lease remained in effect and Coinmach had no obligation to vacate the Cobblestone laundry room. *See Nat'l Alfalfa*, 434 S.W.2d at 764; *Johannsmeyer*, 901 S.W.2d at 156.

We disagree with Jetz that Coinmach's failure to vacate the premises hampered Mr. Botros' ability to calculate the refund due to Coinmach. As the party attempting to terminate the lease under the cancellation clause, Mr. Botros controlled the date of termination. In his March 2, 1999, letter to Coinmach, he told Coinmach to accept the letter "as the 30 days notice in accordance with paragraph 18 of the subject Lease." By giving thirty-days' notice, he did not need to wait for Coinmach to notify him of the date when it would vacate the premises. He could calculate the refund due based upon the thirty-days' notice that he provided. If Coinmach refused to accept a tender of money, Mr. Botros could have placed the money into escrow pending resolution of the dispute. *See generally, Henze v. Shell Oil Co.*, 758 S.W.2d 93, 96 (Mo.App. E.D.1988) (where landlord refused to accept rent payments, tenant placed payments in escrow until lawsuit resolved dispute).

We likewise disagree with Jetz that any tender of money would have been futile. Without satisfying the condition precedent for termination, Mr. Botros never afforded Coinmach an opportunity to accept or reject tender of a refund; given Mr. Botros' failure to tender the money, Coinmach correctly treated the lease as valid and binding. We further disagree with Jetz that *McDermott v. Burpo*, 663 S.W.2d 256 (Mo. App. W.D.1983), compels a different conclusion. Unlike the case before us, *McDermott* involved a contract to purchase real estate, in which the sellers treated the contract as void and breached the contract, rendering any attempt by the purchasers to tender payment useless. *Id.* at 261. This is not our case.

## B. Coinmach's Cross–Claim for Anticipatory Repudiation of Lease

 We next address Coinmach's cross-claim for anticipatory repudiation of the lease. We conclude that the parties effectively cured any anticipatory repudiation by their subsequent performance under the lease.

 "Missouri law recognizes the doctrine of anticipatory breach by repudiation and a party to a contract repudiates that contract by manifesting, by words or conduct a positive intention not to perform." *Mar–Kay Plastics, Inc. v. Alco Standard Corp.*, 825 S.W.2d 381, 384 (Mo. App. W.D.1992). But the parties may nullify or cure the anticipatory repudiation by their subsequent actions. In some cases, the non-repudiating party may refuse to accept the repudiation:

> The party injured by an anticipatory breach has an election to accept or reject the refusal of performance. For the doctrine of breach by anticipatory repudiation to be applied, he or she must treat the repudiation as a breach. That is, he or she must accept and act on it. Moreover, he or she must also act promptly and within a reasonable time. However, the effect of an anticipatory repudiation is not nullified by the fact

that the nonrepudiating party attempts to enforce performance. The renunciation of a contract by the promisor before the time stipulated for performance is not effective unless such repudiation is unequivocally or affirmatively accepted by the promisee. If the promisee declines to accept the renunciation and continues to insist on the performance of the promise, as he or she may do, the contract remains in existence for the benefit, and at the risk, of both parties, and is binding on them . . . .

17B C.J.S. *Contracts* § 538, pp. 202–03 (1999).

 In some cases, the repudiating party may cure the anticipatory repudiation by continuing to perform under the contract. "A repudiation which is followed by continued performance cannot be treated as an anticipatory breach by the other party, since the continued performance amounts to a retraction of any repudiation." 17B C.J.S. *Contracts* § 540, p. 205 (1999).

In this case, both Coinmach and Mr. Botros continued to perform under the Coinmach lease even after Mr. Botros sent his termination notice. Coinmach continued to pay rent and to operate the Cobblestone laundry room. Coinmach did not accept Mr. Botros' purported repudiation; indeed, Coinmach informed Mr. Botros that the parties had a "valid and binding" contract. Mr. Botros likewise continued to accept Coinmach's rent payments and its performance through the end of his tenure as Cobblestone's landlord. Under the circumstances, any anticipatory repudiation by Mr. Botros has been cured by the parties' subsequent performance under the lease. Accordingly, the trial court properly entered judgment in favor of Mr. and Mrs. Botros on Coinmach's cross-claim.

## IV. Conclusion

Because Mr. Botros did not satisfy a condition precedent to terminate the Coinmach lease, that lease was never properly terminated and continued in effect despite the attempted termination. Accordingly, we reverse the judgment of the trial court in favor of respondent Jetz Service Company, Inc. on its petition to quiet title or for declaratory judgment. We affirm the judgment of the trial court on Coinmach's cross-claim for breach of contract against respondents Zarif and Judi Botros.

PAUL M. SPINDEN, P.J., and PATRICIA A. BRECKENRIDGE, J., concur.