# United States Bankruptcy Appellate Panel
## FOR THE EIGHTH CIRCUIT

_____

No. 05-6006 EM

_____

In re: Bridge Information Systems, Inc.,    \*

                                      \*

      Debtor.                       \*

                                      \*

Scott P. Peltz, Plan Administrator,    \*    Appeal from the United States

                                      \*    Bankruptcy Court for the

      Plaintiff-Appellee,           \*    Eastern District of Missouri

                                      \*

           v.                      \*

                                      \*

Edward C. Vancil, Inc.,            \*

                                      \*

      Defendant-Appellant.        \*

_____

Submitted: June 24, 2005
Filed: July 13, 2005

_____

Before DREHER, FEDERMAN, and VENTERS, Bankruptcy Judges.

_____

FEDERMAN, Bankruptcy Judge.

     Scott P. Peltz, the Chapter 11 plan administrator (the Plan Administrator) for debtor, BIS Administration, Inc. f/k/a Bridge Information Systems, Inc., et al., (Bridge) brought a preference action against Edward C. Vancil, Inc. (Vancil, Inc.) to recover a payment in the amount of $46,176.77, made within 90 days prior to Bridge's bankruptcy filing. The bankruptcy court found the transfer was on account of an antecedent debt, that there was no subsequent new value, and that Vancil, Inc.

identified its expert past the discovery deadline, so the expert's testimony would not be allowed. We find that the transfer was not on account of an antecedent debt, therefore, we reverse without reaching the other issues.

FACTUAL BACKGROUND

On February 18, 1994, Edward C. Vancil (Vancil) and Scott Properties executed the Atrium Office Building Lease (the Lease) to provide 1551 square feet of office space for Vancil's law firm, Vancil, Inc. The office was located at 700 Office Parkway, Creve Coeur, Missouri (the Building). The Lease was for a term of three years and contained a renewal option for an additional three years at market rate. On February 14, 1997, Vancil and Scott Properties signed a lease extension for an additional three-year term at the rate of $13.50 for year one, $14.50 for year two, and $15.50 for year three. The extension agreement contained an option to renew for two additional three-year terms at market rate, with market rate defined as "the rental rate quoted by Landlord for the building in which Tenant is located at the time the renewal option is exercised."[1]

In 1999 Bridge purchased the Building and on July 2, 1999, sent a letter to Vancil informing him that it did not intend to renew any leases, and would ultimately need all of the space for its own use. In that letter, Bridge offered Vancil the sum of $10,837 if he would vacate the premises on or before March 31, 1999. That sum was calculated as the difference between the rate Vancil could currently expect to pay for like quarters ($19.50 per square foot) and the rate he was paying ($15.50 per square foot) through the end of the term of the Lease. Vancil interpreted this as an offer to buy out the Lease, which expired on May 31, 2000. However, the offer did not take into consideration the renewal options. Vancil, therefore, did not accept the offer, and on December 15, 1999, he informed Bridge of his intention to exercise the first of the

---

[1]Appellee's Appendix, pg. 17.

two three-year options to renew the Lease. On January 7, 2000, Bridge responded that it had the right to determine market rent, and that the market rate now being quoted for space in the Building was $30.00 per square foot. On January 11, 2000, Vancil disputed the market rate quoted by Bridge, and asked for the names of other tenants to whom such a rate was being quoted. Bridge informed Vancil that since he was the only tenant with an option to renew, he was the only tenant being quoted a market rate. On January 25, 2000, Vancil informed Bridge that he did not consider this a good faith offer since Bridge had indicated in its letter of July 2, 1999, that it was basing its calculations on a cost of $19.50 per square foot.

On April 17, 2000, Bridge then offered Vancil, Inc. $28,000 as a "termination fee." On April 19, 2000, Vancil sent Bridge a letter stating that he believed Bridge had offered other tenants as much as $61,000 to vacate the premises and he would not consider an offer for less than that amount. On May 19, 2000, Bridge notified Vancil, Inc., by letter, that it considered the lease terminated, since Vancil did not accept the determined market rate.

On May 31, 2000, Vancil filed a Petition for Declaratory Relief (the Petition) in the Circuit Court of St. Louis County, Missouri (the Circuit Court). He petitioned the Circuit Court to determine the fair rental rate. In the meantime, Vancil continued to pay rent to Bridge's agent, the Sasone Group (Sasone) at the rate of $19.50 per square foot. In the Petition Vancil stated that he expected to be reimbursed if the Circuit Court determined the market rate was less than $19.50 per square foot, and if the Circuit Court determined the market rate was more than $19.50 per square foot, he would pay any arrearage. Vancil asked the Circuit Court to determine that the Lease was in full force and effect. Vancil paid rent to Sasone until December of 2000.

On June 7, 2000, Bridge again notified Vancil that it had terminated his lease and demanded immediate possession. On June 30, 2000, Bridge filed a Verified

3

Complaint for Unlawful Detainer in the Associate Circuit Court of St. Louis, Missouri. In its lawsuit Bridge sought double rent, immediate possession of the premises, and fees and costs. During the next five months, Bridge continued its gutting of the rest the Building, and Vancil continued to occupy the premises and pay rent at $19.50 per square foot.

During this period, the parties resumed settlement talks, and on November 30, 2000, Vancil accepted a proposal whereby Bridge would pay Vancil a cash payment of $61,176.77. On December 28, 2000, Bridge and Vancil signed the agreement. On December 29, 2000, Vancil received a check from Bridge for the sum of $46,176.77. The remaining $15,000 was to be paid when Vancil, Inc. vacated the premises.

On February 15, 2001, before Vancil, Inc. vacated the premises, Bridge filed its Chapter 11 bankruptcy petition. Vancil, Inc. vacated the premises within two weeks after the filing, but it did not receive the additional $15,000, and has filed a proof of claim for that amount.

In February of 2003, the Plan Administrator filed an adversary seeking to avoid the transfer of $46,176.77. Vancil filed a motion for summary judgment, and on November 11, 2003, the court denied the motion. On October 29, 2004, the court held a hearing and on March 3, 2005, the court found in favor of the Plan Administrator. Vancil, Inc. appealed that order.

STANDARD OF REVIEW

A bankruptcy appellate panel shall not set aside findings of fact unless clearly erroneous, giving due regard to the opportunity of the bankruptcy court to judge the credibility of the witnesses.[2] We review the legal conclusions of the bankruptcy court

---

[2]*Gourley v. Usery (In re Usery),* 123 F.3d 1089, 1093 (8th Cir. 1997); *O'Neal v.*

4

*de novo.*[3] Whether a transfer is made on account of an antecedent debt is an issue of law, which we review *de novo.*[4]

## DISCUSSION

Section 547(b) of the Bankruptcy Code (the Code) authorizes the trustee, or the Plan Administrator in this case, to avoid a transfer made on account of an antecedent debt within 90 days prior to a bankruptcy filing if, on the date the transfer was made, the debtor was insolvent, or became insolvent as a result thereof, and the creditor received more than it would have received in a Chapter 7 liquidation:

> (b)     Except as provided in subsection (c) of this section, the trustee may avoid any transfer of an interest of the debtor in property—
>
>> (1)     to or for the benefit of a creditor;
>>
>> (2)     for or on account of an antecedent debt owed by the debtor before such transfer was made;
>>
>> (3)     made while the debtor was insolvent;
>>
>> (4)     made—
>>
>>> (A)     on or within 90 days before the date of the filing of the petition; or

---

*Southwest Mo. Bank (In re Broadview Lumber Co., Inc.)*, 118 F.3d 1246, 1250 (8th Cir. 1997) (citing *First Nat'l Bank of Olathe, Kansas v. Pontow*, 111 F.3d 604, 609 (8th Cir.1997)). Fed. R. Bankr. P. 8013.

[3]*First Nat'l Bank of Olathe, Kansas v. Pontow (In re Pontow),* 111 F.3d 604, 609 (8th Cir. 1997); *Sholdan v. Dietz (In re Sholdan),* 108 F.3d 886, 888 (8th Cir. 1997).

[4]*Upstairs Gallery, Inc. v. Macklowe West Development Co. (In re Upstairs Gallary)*, 167 B.R. 915, 917 (B.A.P. 9th Cir. 1994).

(B)    between ninety days and one year before the date of the filing of the petition, if such creditor at the time of such transfer was an insider; and

(5)    that enables such creditor to receive more than such creditor would receive if—

(A)    the case were a case under chapter 7 of this title;

(B)    the transfer had not been made; and

(C)    such creditor received payment of such debt to the extent provided by the provisions of this title.[5]

The parties do not dispute that the Plan Administrator has satisfied all elements of section 547(b) of the Code, save the issue of whether the payment was made on account of an antecedent debt. The Plan Administrator argued that the settlement of a dispute  relates back to the time the dispute arose. Vancil, Inc. argued that the payment was nothing more than the negotiated sum for the value of his two remaining options to renew the Lease. The bankruptcy court found that the transfer was in settlement of a claim; therefore, it was on account of an antecedent debt.

We begin with the effect of the settlement agreement. In *Archer v. Warner*,[6] the United States Supreme Court concluded that a bankruptcy court should look behind a settlement, or consent judgment, to determine if it reflected settlement of a valid

---

[5]11 U.S.C. § 547(b). *See also Silverman Consulting, Inc. v. Canfor Wood Products Marketing (In re Payless Cashways)*, 306 B.R. 243, 249 (B.A.P. 8th Cir. 2004), *affirmed*, 394 F.3d 1082 (8th Cir. 2004).

[6]538 U.S. 314, 123 St. Ct. 1462, 155 L. Ed 2d 454 (2003).

claim for fraud.[7] Likewise, the case stands for the proposition that the court should look behind a settlement agreement to discern the nature of the dispute. The bankruptcy court failed to do this. The nature of this dispute was either the market value of the rent Vancil, Inc. would pay in the future, or the value of the two remaining options Vancil, Inc. held to renew the Lease. This is evidenced by the two offers made by Bridge before it attempted to terminate the Lease, and the agreement to settle the dispute for almost exactly the sum Vancil, Inc. demanded in April of 2000. The court found that Vancil, Inc. held a claim against Bridge when it sent a letter to Vancil, Inc. on May 19, 2000, notifying Vancil, Inc. that the Lease was terminated. The problem with this finding is that Vancil, Inc. suffered no damages at that point. Indeed, Vancil, Inc. did not seek monetary damages in the Petition.

The plan administrator, as well as the court, relied on *Energy Cooperative, Inc. v. SOCAP International, Ltd. (In re Energy Cooperative, Inc.),*[8] for the premise that a debtor incurs an antecedent debt, and becomes liable on a claim, at the time the debtor breaches a contract that gives rise to damages. The court began with the definitions of debt and claim in the Bankruptcy Code. The Code defines a claim as:

> (A) right to payment, whether or not such right is reduced to judgment, liquidated, unliquidated, fixed, contingent, matured, unmatured, disputed, legal, equitable, secured, or unsecured;

> (B) right to an equitable remedy for breach of performance if such breach gives rise to a right to payment, whether or not such right to an equitable remedy is reduced to judgment, fixed, contingent, matured, unmatured, disputed, undisputed, secured, or unsecured.[9]

---

[7]*Id.* at 538 U.S. 320, 123 S. Ct. 1467.

[8]832 F.2d 997 (7th Cir. 1987).

[9]11 U.S.C. § 101(5).

And debt is defined as a "liability on a claim."[10] The *Energy Coop* court then found that "'the concepts of debt and claim are coextensive: a creditor has a 'claim' against the debtor; the debtor owes a 'debt' to the creditor.'"[11] Thus, according to the court's analysis, if a creditor has a claim against a debtor, then that debtor has incurred a debt to the creditor. The bankruptcy court found that Vancil, Inc.'s claim against Bridge arose on May 19, 2000, when Bridge sent the letter purporting to terminate the Lease. The bankruptcy court relied on the doctrine of anticipatory breach of contract as the basis for the claim.

Missouri recognizes the doctrine of anticipatory breach by repudiation,[12] and has applied the doctrine to real estate leases.[13] The doctrine applies when one party to a contract repudiates that contract by manifesting by words or conduct a positive intention not to perform, thus giving the injured party an immediate right to damages as if for a total breach.[14] The mere making of a request, however, by one party for more than he is entitled to is not a breach of the contract that gives the other party the right to rescind."[15] Neither an attitude that suggests more negotiations are sought nor requests to change the terms of a contract are enough to constitute repudiation.[16] The letter of May 19, 2000, informing Vancil, Inc. that Bridge was terminating the Lease

---

[10]*Id.* at § 101(12).

[11]*Id.* at 1001 (quoting Senate Report at 23, 1978 U.S. Code Cong. & Ad. News at 5809).

[12]*Jetz Serv. Co. v. Botros*, 91 S.W.3d 157, 163 (Mo. Ct. App. 2002).

[13]*TDV Transportation, Inc. v. Keel*, 966 S.W. 2d 347, 348 (Mo. Ct. App. 1998).

[14]*Botros*, 91 S.W.3d at 163. *See also* **Black's Law Dictionary** 542 (Bryan A. Garner, ed. 1996)

[15]*Wooten v. DeMean*, 788 S.W.2d 522, 526 (Mo. Ct. App. 1990).

[16]*Id.*

did not manifest a positive intention not to perform. Moreover, neither party acted as if the Lease was terminated. Vancil, Inc. continued to pay rent and remain in the Building. Bridge accepted the rental payments, and allowed Vancil, Inc. to remain on the premises. No damages, therefore, were suffered by Vancil, Inc. as a result of the letter, and no debt was created.

The court in *Energy Cooperative, Inc. v. SOCAP (In re Energy Cooperative, Inc.)*,[17] did hold that a non-breaching party's claim arises on the date one party to a contract repudiates a contract. The facts of that case, however, are distinguishable. Energy Cooperative agreed to purchase 80,000 tons of crude oil from SOCAP each quarter of 1981. It, however, never made the first purchase. Instead, on March 11, 1981, Energy Cooperative repudiated the contract.[18] On March 20, 1981, within 90 days of its bankruptcy filing, Energy Cooperative agreed to pay, and did pay, SOCAP the sum of $1.6 million as compensation for its breach. This sum represented the amount of the damages incurred by SOCAP when Energy Cooperative refused to purchase 80,000 tons of crude oil at the agreed price. The trustee subsequently sought to avoid the transfer as an avoidable preference. The Seventh Circuit found that Energy Cooperative incurred a debt to SOCAP when it repudiated the contract on March 11, 1981, and that SOCAP was damaged thereby in the stated amount.[19] We agree that SOCAP's claim arose when the repudiation took place. That is not, however, the case here, since Vancil, Inc. had incurred no damages as of May 19, 2000. Bridge argues that it improperly terminated the lease, and thereby damaged Vancil, Inc. But the dispute between the parties was over the market value of the rent under the option to renew. Had Vancil, Inc. prevailed in its lawsuit, the issue would have been how much rent it owed Bridge, not how much money Bridge owed to it.

---

[17] 832 F.2d 997 (7th Cir. 1987).

[18] *Id.* at 999.

[19] *Id.* at 1001.

The negotiations between the parties were not over the damages that Bridge owed Vancil, Inc. by virtue of the May 19, 2000, letter. Such negotiations were, instead, over how much Bridge would pay to buy out Vancil, Inc's options to renew. Indeed, even prior to the date of the letter, Bridge had offered $28,000 for such options, and Vancil, Inc. had demanded almost exactly the amount ultimately agreed upon.[20]

In Missouri "'the holder of an option to renew a lease has an interest in the land. The right of renewal constitutes a part of the tenant's interest in the land, and forms a substantial and integral part of the agreement.'"[21] The dispute here was as to the market rate of rent Vancil, Inc. would pay to Bridge after Vancil, Inc. validly exercised one of its options to renew the Lease. The settlement simply involved an agreement to purchase those options from Vancil, Inc.

From the beginning of this dispute Bridge and Vancil, Inc. were attempting to negotiate the value of the two renewal options remaining on the Lease. The options were a valuable asset. At the end of the negotiations the parties agreed on a value, with Bridge paying Vancil, Inc. $46,176.77 down, the balance payable only after Vancil, Inc. vacated the premises. These funds were paid to get Vancil, Inc. to give up its options, not to compensate it for damages suffered from any prior actions taken by Bridge. That is not a payment on account of an antecedent debt; therefore, section 547(b) of the Code is not applicable. We conclude the court erred when it failed to look behind the settlement to discern that this was a negotiation over the value of an asset, and when it incorrectly based its holding on the doctrine of anticipatory breach

---

[20]We note that Bridge ultimately agreed to pay slightly more for the options than Vancil, Inc. had demanded, apparently reflecting the return of a security deposit and other rental adjustments.

[21]*Santa Fe Trail Neighborhood Redevelopment. Corp. v. W.F. Coen & Co.*, 154 S.W.3d 432, 441 (Mo. Ct. App. 2005) (quoting *Land Clearance for Redevelopment Corp. v. Doernhoefer*, 389 S.W.2d 781, 785 (Mo. 1965)).

of contract. We, therefore, reverse the judgment of the court and conclude that the transfer of $46, 176.77 on December 29, 2000, was not on account of an antecedent debt. The judgment of March 3, 2005 is reversed, and the matter is remanded to the bankruptcy court for entry of judgment in favor of defendant Edward C. Vancil, Inc.

_____