# United States Court of Appeals
## FOR THE EIGHTH CIRCUIT

_____

No. 05-3108
No. 05-3196

_____

In re: Bridge Information Systems, Inc.,   *
                                          *
              Debtor,                *

----------------------------------------------  *
                                          *

Scott P. Peltz, Administrator,        *
                                          * Appeals from the United States
          Appellant/Cross-Appellee,  * Bankruptcy Appellate Panel.
                                          *
       v.                         *
                                          *
Edward C. Vancil, Inc.,           *
                                          *
          Appellee/Cross-Appellant.  *

_____

Submitted: May 15, 2006
Filed: January 10, 2007

_____

Before MURPHY, JOHN R. GIBSON, and BENTON, Circuit Judges.

_____

JOHN R. GIBSON, Circuit Judge.

Scott Peltz appeals from the Bankruptcy Appellate Panel's decision reversing the bankruptcy court's order granting summary judgment to Peltz in his preference action against Edward C. Vancil, Inc. Peltz is the Chapter 11 plan administrator for the debtor, Bridge Information Systems, Inc. Vancil leased office space for its law practice in commercial property owned by Bridge. Bridge and Vancil entered into a

settlement agreement and Bridge paid Vancil $46,176.77 under that agreement less than two months before Bridge filed its Chapter 11 petition. Peltz filed this adversary proceeding to avoid the payment as a preferential transfer under 11 U.S.C. § 547(b), see 11 U.S.C. § 550(a)(1), and the bankruptcy court conducted a trial on the complaint and entered judgment in favor of Peltz. Vancil appealed to the Bankruptcy Appellate Panel, which reversed the bankruptcy court and remanded for entry of judgment in favor of Vancil. Peltz v. Edward C. Vancil, Inc. (In re Bridge Info. Sys., Inc.), 327 B.R. 382 (B.A.P. 8th Cir. 2005). On appeal, Peltz asserts that the bankruptcy court was correct in ruling that the payment was preferential because it was made on account of an antecedent debt. Vancil filed a cross-appeal. We affirm the Bankruptcy Appellate Panel's decision and consequently do not reach the issues in the cross-appeal.

Vancil first entered into a thirty-month lease agreement with Scott Properties, Bridge's predecessor-in-interest, in 1994. Before the lease expired, the parties executed a three-year extension until May 31, 2000. This extension provided Vancil the option to renew the lease for two more three-year terms with all of the same provisions except base rent. The agreement specified that the base rent of any new lease that would result from Vancil exercising its option would be "market rate," defined as "the rental rate quoted by Landlord for the building in which Tenant is located at the time the renewal option is exercised."

Bridge purchased the property from Scott Properties while Vancil was a tenant under its first lease extension. On July 2, 1999, the Sansone Group, which Bridge had hired to manage the property, sent a letter to Vancil announcing that Bridge did not intend to renew any of the existing leases because it intended to use the building "to accommodate Bridge's continued growth and need for additional office space." In fact, because it was anxious to occupy space quickly, Bridge offered to pay Vancil $10,837 if it would vacate the premises by March 31, 2000, two months before its unrenewed lease would expire. This amount included a market adjustment for the

difference between the rental rate Vancil could expect to pay for similar property and the rate it was paying, moving costs, an incentive, and a signing bonus. The offer was to remain open for two weeks only.

Vancil replied to the Sansone letter that same day, asking for figures to support each individual category of the relocation compensation package. Vancil also asked for "confirm[ation] that your records demonstrate that my lease entitles me to two (2) options which I have always and still intend to exercise." Vancil did not accept the buy-out offer. Instead, on December 15, 1999, Vancil sent a letter to Bridge and Sansone informing them of its intention to exercise the first of two three-year options to renew its existing lease, which would have extended the lease to May 31, 2003. Sansone acknowledged Vancil's statement and set the market rate for the lease extension at $30 per square foot, double its current rate. Vancil disputed the market rate and asked Sansone to identify any tenant or potential tenant in the same building to whom Sansone was quoting a market rate of $30. Sansone informed Vancil that it was the only tenant with a renewal option in its lease, and because Bridge was no longer marketing the building, Vancil was the only tenant to receive a market rate quote.

Vancil viewed the rate as "an arbitrary number created out of thin air to be used in an attempt to remove me from this building." In its January 25, 2000, letter to that effect, Vancil also reiterated that it intended to stay in the building and to comply with its lease requirements. In turn, Vancil expected Bridge to fulfill its obligations, including setting a reasonable market rate.

Although the record does not reflect the substance of their conversations, later correspondence indicates that Sansone suggested alternative office space for Vancil's law practice and said that it would urge Bridge to revise its proposal to buy out the balance of Vancil's lease. In a letter of April 11, 2000, Vancil informed Sansone that, while it still intended to remain, it would consider relocating if Bridge would see to

it that Vancil would incur no cost and would have minimal disruption to its office and practice. Sansone responded six days later with an offer from Bridge to pay a "termination fee" of $28,000 to cover "out of pocket costs" and provide "a sizable incentive." Vancil did not explicitly reject the offer, but wrote in an April 19 letter that other tenants had reported receiving compensation offers in excess of $61,000 to terminate their leases, and Vancil would not accept less compensation than Bridge was paying other tenants.

One month later, Sansone sent a letter informing Vancil that Bridge considered its lease terminated as of May 31, 2000, "due to your non-acceptance of the determined market rental rate for your option period." Vancil's response was in the form of a petition, filed in state court on May 31, which sought a declaration that its lease continued to be in full force and effect at a fair market rate of between $17.50 and $19.50 per square foot. Vancil also informed Bridge that it would continue paying rent at a rate of $19.50.

Based on its earlier declaration that Vancil's lease would expire on May 31, Bridge made written demand of Vancil, in a June 7 letter, for immediate possession of the premises. Bridge formalized its demand by filing an unlawful detainer action in state court on June 30. From that point, the parties negotiated through their respective attorneys. Bridge made an offer of settlement to which Vancil made a September 14 counter proposal. Another round or two of offers and demands took place over the next two months, and throughout the negotiations the attorneys characterized their efforts as working towards a resolution of their clients' dispute.

The parties ultimately executed a Mutual Settlement Agreement and Release on December 28, 2000, that generally characterizes the settlement as a compromise of the parties' disputes. The only specific mention of the source of the dispute is in the preamble, which recites that "a dispute arose between Bridge and Vancil as to whether Vancil, in December, 1999, effectively renewed his lease upon the Premises

-4-

for another three year term." The agreement allowed Vancil to continue its lease rent-free for another two months and called for a $61,176.77 payment by Bridge to Vancil. The settlement payment was to be divided into two checks; the first was to be in the amount of $46,176.77 and be delivered upon execution of the Agreement. The second, in the amount of $15,000, was to be delivered upon Vancil's vacating of the premises. The first check was delivered as agreed and Vancil vacated the premises as required by the Settlement Agreement, but Bridge did not make the second payment because in the interim it had filed its petition for relief under Chapter 11. Vancil later filed a claim against Bridge's bankruptcy estate for the $15,000 second installment.

Peltz, the Plan Administrator, brought this adversary action against Vancil, seeking to avoid the settlement payment of $46,176.77 as a preferential transfer under 11 U.S.C. § 547(b). See 11 U.S.C. § 550(a)(1). Vancil filed a summary judgment motion, which the bankruptcy court denied with leave to renew after the close of discovery. Peltz v. Edward C. Vancil, Inc. (In re Bridge Info. Sys., Inc.), 302 B.R. 41, 44 (Bankr. E.D. Mo. 2003) ("Vancil I"). The court likewise denied Vancil's renewed motion, id. at 49, conducted a trial, and ultimately entered judgment in favor of Peltz. Vancil appealed to the Bankruptcy Appellate Panel for the Eighth Circuit. The Panel reversed the bankruptcy court judgment and remanded for entry of judgment in favor of Vancil. Peltz v. Edward C. Vancil, Inc. (In re Bridge Info. Sys., Inc.), 327 B.R. 382 (B.A.P. 8th Cir. 2005) ("Vancil II"). This appeal followed.

## I.

Peltz argues that the bankruptcy court correctly found that the $46,176.77 settlement payment was a preferential transfer because it was made on account of an antecedent debt, and urges this court to reject the Bankruptcy Appellate Panel's contrary finding. Peltz brought this preference action under § 547 of the Bankruptcy Code. That section allows Peltz to avoid a transfer on account of an antecedent debt made within 90 days before Bridge filed its bankruptcy petition, if Bridge was

insolvent on the date of the transfer or became insolvent because of it, and if Vancil received more than it would have received in a Chapter 7 liquidation. See 11 U.S.C. § 547(b). The parties agree that all of the elements of section 547(b) are satisfied except that they dispute whether the payment was made on account of an antecedent debt. We review under the same standards used by the Bankruptcy Appellate Panel, which means we review the bankruptcy court's factual findings for clear error and its legal conclusions de novo. Moon v. Anderson (In re Hixon), 387 F.3d 695, 700 (8th Cir. 2004).

"A debt is 'antecedent' if it was incurred before the allegedly preferential transfer." Jones Truck Lines, Inc. v. Cent. States, S.E. & S.W. Areas Pension Fund (In re Jones Truck Lines, Inc.), 130 F.3d 323, 329 (8th Cir. 1997). The date a debt is incurred is "the date upon which the debtor first becomes legally bound to pay." Iowa Premium Serv. Co., Inc. v. First Nat'l Bank in St. Louis (In re Iowa Premium Serv. Co., Inc.), 695 F.2d 1109, 1111 (8th Cir. 1982). Here, where the date the debt was incurred is at issue, the determination of whether the transfer was made on account of an antecedent debt is a mixed question of law and fact, which we review de novo. See Southmark Corp. v. Marley (In re Southmark Corp.), 62 F.3d 104, 106 (5th Cir. 1995).

Peltz asserts that the latest date on which Bridge incurred its debt to Vancil was May 31, 2000, when Vancil filed its petition in state court seeking a declaratory judgment that its lease was still in effect because Vancil had exercised its option to extend the lease beyond that date. Although Vancil did not seek damages in that suit, Peltz asserts that Vancil's position that Bridge's quoted market rate was inconsistent with the terms of the lease equates to Bridge breaching the lease. Peltz further asserts that the breach gave rise to a right for Vancil to recover damages, even if Vancil did not seek them. In the alternative, Peltz advocates the bankruptcy court's finding that Bridge anticipatorily breached the lease on May 19, 2000, when it sent a letter informing Vancil that Bridge considered the lease terminated as of May 31 because Vancil had not accepted its determined market rental rate. The bankruptcy court held

that the anticipatory breach gave rise to a claim against Bridge, and that claim and debt are synonymous under the Bankruptcy Code.

> Although the Code does not define when the debtor incurs a debt, it does define a "debt" as a liability on a claim. 11 U.S.C. § 101(12). Accordingly, the concept of a debt and a claim are coextensive under the Code and a debtor incurs a debt to the creditor for purposes of § 547(b)(2) as soon as the creditor would have had a claim against the debtor's estate.

Vancil I, 302 B.R. at 45-46 (citations omitted). The bankruptcy court's finding of anticipatory repudiation of the lease – accomplished through Bridge's May 19, 2000, letter terminating the lease – compelled its conclusion that Bridge's settlement payment to Vancil was on account of an antecedent debt.

The Bankruptcy Appellate Panel analyzed the situation differently. It first noted that the bankruptcy court was obligated but had failed to look behind the settlement agreement to discern the nature of the dispute. Vancil II, 327 B.R. at 386-87 (citing Archer v. Warner, 538 U.S. 314, 320-21 (2003)). While the Panel agreed that the doctrine of anticipatory breach by repudiation exists under Missouri law, it concluded that it does not apply in this case. The undisputed facts concerning the parties' behavior after May 19 revealed that neither party acted as though the lease was terminated; Vancil continued paying rent, Bridge continued to accept the rent, and Vancil remained in the building. Therefore, Vancil suffered no damages as a result of Bridge's May 19 letter and no debt was created. Id. at 388.

> [T]he dispute between the parties was over the market value of the rent under the option to renew. Had Vancil, Inc. prevailed in its lawsuit, the issue would have been how much rent it owed Bridge, not how much money Bridge owed to it. . . .
>
> In Missouri the holder of an option to renew a lease has an interest in the land. . . . The dispute here was as to the market rate of rent Vancil, Inc.

would pay to Bridge after Vancil, Inc. validly exercised one of its options to renew the Lease. The settlement simply involved an agreement to purchase those options from Vancil, Inc. . . .

That is not a payment on account of an antecedent debt; therefore, section 547(b) of the Code is not applicable. We conclude the [bankruptcy] court erred when it failed to look behind the settlement to discern that this was a negotiation over the value of an asset, and when it incorrectly based its holding on the doctrine of anticipatory breach of contract.

Id. at 388-89 (internal quotations omitted). Peltz argues that Bridge's conduct on and after May 19 cannot evidence anything other than a clear intention to repudiate the lease. The undisputed facts show otherwise. The May 19 letter was part of the ongoing sparring between Bridge and Vancil that began with Bridge's first offer to buy out the remaining eleven months of Vancil's lease. Bridge had just purchased the property before it made that offer, and at the time did not realize that Vancil's lease was unique among the building's tenants in that it contained two renewal options. Throughout the correspondence that followed, the parties had a habit of not directly responding to each other but of instead asserting a new position. Before Bridge sent its May 19 letter, Vancil had notified Bridge that it was exercising its option to renew its lease and repeated its intention to remain in the building and pay rent. Bridge had increased its offer in April, a component of which it called a "termination fee," and Vancil had questioned the adequacy of the offer as compared to what Bridge was paying other tenants to buy out their leases.

After Bridge sent its May 19 letter, the parties filed dueling state court petitions and continued to negotiate. Bridge made another settlement offer and the parties went through a number of counter-offers before arriving at their settlement in December. Viewed in the context of the facts as a whole, there is nothing in Bridge's May 19 letter that makes it stand out as a defining act in the midst of the parties' eighteen-month negotiations.

-8-

The Bankruptcy Appellate Panel correctly applied the law to the facts to reach its conclusion that Bridge's payment to Vancil was not on account of an antecedent debt. Instead, it was a payment by the landlord to the tenant to buy out the tenant's future option, as provided in its lease, to renew for two more three-year terms. We need not repeat the court's well-reasoned opinion, including its analysis of relevant case law, but we approve of it.

On appeal, Peltz relies on two cases that do not appear in the Bankruptcy Appellate Panel's opinion. In its brief, Bridge likens this case to Levine v. Custom Carpet Shop, Inc. (In re Flooring America, Inc.), 302 B.R. 394 (Bankr. N.D. Ga. 2003). Flooring America, the debtor, granted Custom Carpet a franchise to operate retail stores within an exclusive area. Custom Carpet later accused Flooring America of breaching the franchise agreement by infringing on its exclusive territory, and asserted that Flooring America owed it additional money under a vendor rebate program. The parties entered into a termination and release agreement in which Flooring America paid Custom Carpet $50,000 for a refund of its franchise fee and payment for all rebates owed. Their relationship ended with the execution of the agreement, and less than ninety days later Flooring America filed its bankruptcy petition. Id. at 396-97.

The bankruptcy court concluded that the payment was on account of an antecedent debt. The claim arose when Flooring America breached the exclusive territory provisions of the franchise agreement and stopped paying rebates to Custom Carpet. The debt arose at the same time, given the coextensive nature of claim and debt. Flooring America's later payment to Custom Carpet was on account of this antecedent debt. Id. at 402. The only thing Flooring America received in exchange for its $50,000 settlement payment was freedom from liability on an antecedent debt. The case bears no resemblance to the facts at hand.

Peltz describes <u>Upstairs Gallery, Inc. v. Macklowe West Development Co., L.P.</u> (In re Upstairs Gallery, Inc.), 167 B.R. 915 (9th Cir. B.A.P. 1994), as having "nearly identical facts" to this case. The debtor was a tenant who had a five-year lease, but within two years the tenant and landlord agreed to terminate the lease with the tenant paying a termination fee. Within ninety days of paying the termination fee, the tenant filed a petition in bankruptcy. <u>Id.</u> at 916-17. The Bankruptcy Appellate Panel held that the payment was on account of an antecedent debt that arose at the time the lease was signed. Under the lease, the landlord had a claim for monthly rental payments and the tenant had a liability for that claim that equaled a debt. Although the tenant argued that the payment was not on account of an antecedent debt because it was giving up future possession along with the payment, the court held that the legal effect of the payment was that it extinguished the debt for three of the five years of ongoing monthly rent that the tenant had incurred. "The fact that that debt would have extended into the future but for the settlement agreement does not change the antecedent nature of the debt." <u>Id.</u> at 918. This case is easily distinguished. Bridge, the landlord, did not incur a debt to its tenant, Vancil, by virtue of the lease agreement. Vancil had no claim to receive payment under the lease.

The situation in <u>Upstairs Gallery</u> is the more typical scenario in lessor-lessee preference actions, where a debt is antecedent because the debtor lessee incurred it before making the payment that is allegedly preferential. There, the lessee's legal obligation to pay arises each month the lessee fails to pay rent. No such periodic obligation to pay arises on the part of the lessor.

II.

Vancil raises two arguments in its cross-appeal. In the bankruptcy court, Vancil contended that even if the settlement payment was preferential, Peltz could not avoid the transfer because it provided new value to Bridge in exchange for the payment. The bankruptcy court concluded that Vancil had not submitted sufficient evidence that it provided Bridge with new value and that, even if it had, Vancil had not established the quantum of that value. The bankruptcy court also refused to allow testimony from Vancil's proposed expert witness who would have offered his opinions concerning market rates and lease values in the area. The court found that the disclosure of the witness was untimely under Fed. R. Civ. P. 26(a)(2).

Because we are affirming the Bankruptcy Appellate Panel's opinion, the cross-appeal is moot and we have no reason to rule on these issues.

* * *

The Bankruptcy Appellate Panel accurately applied the law with respect to antecedent debt and we affirm its opinion. As a result, the bankruptcy court judgment of March 3, 2005, is reversed, and the matter is remanded to the bankruptcy court for entry of judgment in favor of Vancil.

_____

-11-