**MAR–KAY PLASTICS, INC., Respondent,**

v.

**ALCO STANDARD CORPORATION, Appellant.**

**No. WD 44630.**

Missouri Court of Appeals, Western District.

March 3, 1992.

Robert J. Harrop, James L. Moeller, Jacqueline D. Lorie, Kansas City, for appellant.

David P. Hargrave, Kansas City, for respondent.

Before BERREY, P.J., and ULRICH and HANNA, JJ.

BERREY, Presiding Judge.

This appeal arises out of a breach of contract action brought by the plaintiff/respondent Mar–Kay Plastics, Inc., (Mar–Kay) against Alco Standard Corporation (Alco), the defendant and appellant in this action. Following a jury trial, a verdict was returned for Mar–Kay in the sum of $322,994.

Alco alleges numerous trial court errors. Alco first contends the trial court erred in admitting evidence of what it considered to be pre-breach production capacity. It contends this pre-breach production capacity is not relevant to Mar–Kay's claimed status as a lost volume seller. Alco secondly contends the trial court erred in submitting the verdict directing instruction because the verdict director did not accurately set forth the law on repudiation of a long term contract. Alco specifically suggests the trial court erred in failing to include a requirement of an "overt communication" in the verdict director, and also contends the trial court erred in failing to include language in the verdict director that would require Mar–Kay write to Alco or communicate with it before Mar–Kay could be found in breach. And finally, Alco contends the trial court erred in denying its motion for new trial on the ground the verdict was against the weight of the evidence because there was not substantial evidence supporting the award of damages for bottles produced during but sold after the contract term.

The relationship between Mar–Kay and Alco began in 1985 when Mar–Kay entered into negotiations with a predecessor of Alco, Riekes Packaging. Prior to this time, Mar–Kay had been involved in the manu-

facturing of plastic containers, but had not been involved in the manufacture of syrup bottles. In reliance on a contract with Alco, Mar–Kay purchased a Fisher blow mold plastic machine to manufacture 24–ounce syrup bottles for Alco. Alco executed a three year contract with Mar–Kay to purchase 24 million syrup bottles over a three year period. This contract did not provide for minimum monthly purchases of syrup bottles by Alco.

The initial contract called for production to commence in November of 1985. However, Mar–Kay experienced some difficulties which delayed the commencement of the contract. Later, when the problems had been remedied, the parties executed an amendment to the original contract extending the start date from November 1, 1985, to April 1, 1986. Following this amendment, the time period of the contract extended from April 1, 1986, to March 31, 1989. Following the amendment, Mar–Kay experienced a few more difficulties, but, by late 1987, the problems had diminished and sales were up.

In July of 1987, Alco made the decision to divest itself of several of its operating divisions, including Alco packaging. Alco informed Mar–Kay of the impending sale and advised Mar–Kay it would be transferring all of Alco Packaging's obligations, assets and contracts to the new buyer. The ultimate buyer of Alco Packaging was M.R. Berlin & Company (Berlin), which acquired rights to the Alco name as well as the business and assets of Alco Packaging. The contract between Mar–Kay and Alco Packaging was to be transferred to Berlin upon the sale of the assets. However, due to an oversight, it was omitted from the final asset purchase agreement.

During the first three to four months of 1988, after Berlin acquired Alco Packaging, Berlin continued to buy the 24–ounce syrup bottles under the contract. However, by June of 1988, Berlin had ceased ordering any syrup bottles. At this time Mar–Kay contacted Berlin to notify it that Berlin was required to purchase a certain number of syrup bottles during the period of the contract. Berlin informed Mar–Kay that Berlin was not bound under the contract because the contract was not transferred when Berlin bought Alco Packaging. Mar–Kay then declared Alco and Berlin in breach of the contract. Following this, Mar–Kay proceeded with its plan to devote part of the machine time to producing sport bottles. During 1988, Mar–Kay alternated production of the syrup bottles and the sports bottles.

Mar–Kay seeks to recover the lost profits from the 7,722,868 syrup bottles which remained to be purchased under the contract agreement. Alco complains Mar–Kay mitigated its damages by producing the sports bottles and should not receive double compensation. In its closing statement, Alco fully admitted breaching the contract and stated it was prepared to compensate Mar–Kay for any loss. However, Alco denied being responsible for the amount of damages requested by Mar–Kay.

Alco first argues the trial court erred in admitting evidence of Mar–Kay's pre-breach production capacity because Alco claims it is irrelevant to Mar–Kay's status as a lost volume seller. A lost volume seller has been defined as a seller who faces less demand for its product than it has capacity to satisfy. 1 J. White & R. Summers, *Uniform Commercial Code 3d*, 358–59 (1988).

Alco alleges the breach occurred sometime in June of 1988 and, therefore, the time period for computing damages should be after that date. However, Mar–Kay contends the breach occurred in January of 1988, at the time Alco sold its business to Berlin and failed to transfer the Mar–Kay contract with the agreement. Counsel for Alco fully admitted "Alco made a mistake and when that business was sold, the agreement was not included in the assets that were transferred."

Mar–Kay contacted Berlin in June of 1988 alleging it had breached the agreement to purchase the syrup bottles. At that time, Berlin notified Mar–Kay it was not bound by the agreement because the contract had not been assigned to Berlin in January of 1988. Because the contract was never transferred, Mar–Kay alleges

the breach occurred in January 1988. Alco notified Mar–Kay it was going to sell the business to Berlin and further indicated it was not to worry about the syrup bottle contract because the contract would be transferred with the sale. Alco contends the breach date could not be in January because Mar–Kay was not even aware of the failure to transfer the contract until June of 1988. However, Mar–Kay maintains that not transferring the contract at the time Alco sold its packaging subdivision was a breach and damages should be measured by that date. "A party repudiates a contract by manifesting a positive intention not to perform. This manifestation may be by words or conduct." *Gateway Aviation, Inc. v. Cessna Aircraft Co.,* 577 S.W.2d 860, 862 (Mo.App.1978). Clearly, repudiation can occur by conduct alone.

In the case at bar, there was sufficient evidence for the trial court to find Alco repudiated the contract by Alco's conduct of not transferring the contract with the sale to Berlin. The trial court was correct in admitting evidence of production from the January, 1988, date. Appellant's point I is denied.

Alco next contends the trial court erred in admitting a verdict director which failed to require an "overt communication of an intention not to perform" in order to find an anticipatory breach or repudiation of the agreement. Instruction No. 6, the verdict director, stated:

> You are instructed that the plaintiff and defendant did enter into an agreement whereby plaintiff agreed to produce and sell to defendant a minimum of 24,000,-000 24 oz. plastic syrup containers over a three year period commencing on April 1, 1986, and ending on March 31, 1989, and defendant agreed to order and purchase from plaintiff the said minimum 24,000,-000 plastic syrup containers over said three year period.

Your verdict must be for the plaintiff if you believe:

> First, plaintiff performed its agreement by producing and selling to defendant and others 16,277,132 of such containers, and during the period commencing May 7, 1987, and ending on March 31, 1989, plaintiff was ready to perform the production and sale of the remaining 7,722,-868 of the containers, and

> Second, defendant failed to perform its agreement by not ordering and purchasing the remaining 7,722,868 of the containers it had promised to order and purchase during the period commencing May 7, 1987, and ending on March 31, 1989, and

> Third, the effect of defendant's failure to perform substantially impaired the value of the agreement to plaintiff, and

> Fourth, the plaintiff was thereby damaged.

> The phrase substantially impaired as used in this instruction means the defendant's failure to perform resulted in inconvenience or injustice to the plaintiff.

As we stated earlier, Missouri law recognizes the doctrine of anticipatory breach by repudiation and a party to a contract repudiates that contract by manifesting, by words or conduct a postitive intention not to perform. *Carmel v. Dieckmann,* 617 S.W.2d 459, 460 (Mo.App.1981). An act of repudiation is sufficient. It is not necessary that the repudiation be made by word. With this in mind, it becomes clear that the trial court did not err in refusing to add language to the verdict director requiring an overt communication of breach by Alco. Alco itself admitted a breach occurred. The evidence is sufficient to support the finding that the repudiation of the contract was made when Alco failed to transfer its contract with Mar–Kay with the sale of the company to Berlin.

In conjunction with the second issue, Alco also maintains the trial court erred in failing to include language in the verdict director that would require that Mar–Kay write to Alco or communicate with Alco before Alco could be found in breach. When counsel for Alco objected to the verdict director he only objected on the grounds that language requiring an overt communication was necessary. Alco also failed to specifically raise the objection in its motion for new trial. Counsel for Alco

at no time mentioned that Mar–Kay had to notify Alco before Mar–Kay could claim breach as a ground for error. This being the case, we cannot address this issue on appeal as it was not raised at the trial court level.

The failure to get down to the specifics when objecting to instructions either at trial or in motions for new trial, deprives trial courts of the opportunity to correct their own errors and will not be countenanced on appeal.

*Ideker, Inc. v. Missouri State Highway Comm'n,* 654 S.W.2d 617, 623 (Mo.App. 1983). Appellant's point II on appeal is denied.

■ For its last point, Alco contends the trial court erred in not granting its motion for a new trial. Alco specifically contends the verdict was against the weight of the evidence because there was not substantial evidence to support the award of damages reached by the jury.

The determination of whether a verdict is against the weight of the evidence is within the exclusive province of the trial court; On appeal this court does not weigh the evidence but determines whether sufficient evidence supports the verdict. We must consider the evidence here in the light most favorable to plaintiff giving him the benefit of all reasonable inference and disregarding defendants' evidence except as it may support the verdict.

*Marshall v. Edlin,* 690 S.W.2d 477 (Mo. App.1985). Both parties submitted evidence regarding the production of the syrup bottles and the probability that there were sufficient machine days to support the production of the syrup bottles as well as the production of sport bottles. The evidence was submitted to the jury and the jury determined the evidence justified awarding all of the lost profit requested by Mar–Kay. We will not disturb this determination on appeal. Appellant's point III on appeal is denied.

All concur.