ACCEPTED
05-08-01584-CV
FIFTH COURT OF APPEALS
DALLAS, TEXAS
10/23/2015 3:45:32 PM
LISA MATZ
CLERK

# GIBSON DUNN

Gibson, Dunn & Crutcher LLP

2100 McKinney Avenue
Dallas, TX 75201-6912
Tel 214.698.3100
www.gibsondunn.com

James C. Ho
Direct: +1 214.698.3264
JHo@gibsondunn.com

FILED IN
5th COURT OF APPEALS
DALLAS, TEXAS
10/23/2015 3:45:32 PM
LISA MATZ
Clerk

October 23, 2015

VIA ELECTRONIC FILING

Lisa Matz
Clerk of the Court
Fifth Court of Appeals
600 Commerce Street, Suite 200
Dallas, Texas 75202

Re:     Case No. 05-08-01584-CV; *TXU Portfolio Management Company, L.P. v. FPL Energy, LLC, et al.*

Dear Ms. Matz:

Appellant TXU Portfolio Management Company, L.P. ("TXUPM") files this post-submission brief to respond to the new "impossibility" theory of cover damages explored at oral argument by Justice Evans.  Under this theory, as we understand it, breach could have occurred at the moment that it became mathematically impossible for FPL to avoid breach—that is, at the moment when FPL owed TXUPM more energy under its annual minimum quantity obligation than it could possibly produce, even if it produced at maximum capacity for the rest of the year.

TXUPM will address three points in turn:

1) First, even if an "impossibility" theory of cover damages is adopted by this Court, it does not make sense to apply that theory under the facts of this case.

2) Second, even if an "impossibility" theory is adopted in this case, that *undermines* FPL's theory that cover damages should apply and *supports* TXUPM's theory that market damages should apply.

3) Third, this theory of cover damages has never been advanced by FPL, and thus it is waived.

For these reasons, this Court should decline to adopt a theory of breach by impossibility, hold that market damages are the appropriate measure of damages in this case, and remand to the district court for a determination of TXUPM's market damages.

* * *

Beijing · Brussels · Century City · Dallas · Denver · Dubai · Hong Kong · London · Los Angeles · Munich
New York · Orange County · Palo Alto · Paris · San Francisco · São Paulo · Singapore · Washington, D.C.

# GIBSON DUNN

***Even if an "impossibility" theory of cover damages is adopted by this Court, that theory should not be applied under the facts of this case***.

        During oral argument, Justice Evans explored a theory of cover damages that has not been raised by either party. Under this theory, FPL's breach could possibly have been determined at some point before the end of the contract year at issue, when it became mathematically impossible for FPL to avoid breach because FPL owed TXUPM more energy under its annual quantity obligation than it could produce, even if it produced at maximum capacity for the rest of the contract year. We have found nothing in Texas law to either support or reject this theory of breach. And outside Texas, there are authorities on both sides.[1] However, the Court need not decide whether this theory is available here because, for the reasons set forth below, the facts in this case do not support application of such a theory even if such a theory were available in Texas.

        The contract requires FPL to provide a minimum *annual* quantity of both electricity and RECs. It is FPL's failure to meet that annual quantity obligation for either electricity or RECs that constitutes the relevant breach in this case—as both this Court and the Supreme Court have already held, and as we explained in response to questions from Justice Whitehill. *See, e.g.*, *TXU Portfolio Mgmt. Co. v. FPL Energy, LLC*, 328 S.W.3d 580, 584 (Tex. App.—Dallas 2010) ("At trial, the Wind Farms did not dispute their failure to provide the minimum annual quantities of renewable energy as alleged by TXUPM."); *FPL Energy, LLC v. TXU Portfolio Mgmt. Co.*, 426 S.W.3d 59, 62 (Tex. 2014) ("FPL failed to produce the agreed

---

[1] For example, courts are divided over whether breach occurs due to impossibility, where the putative breaching party has not taken a voluntary, affirmative act of refusal to perform. *Contrast United Corp. v. Reed, Wible and Brown, Inc.*, 626 F. Supp. 1255, 1257-58 (D.V.I. 1986) (requiring "a voluntary affirmative act" because "[n]onfeasance, such as United was faced with, cannot support a finding of repudiation under the Restatement's definition"), *with Larose v. Porter*, 177 A. 297, 299 (N.H. 1935) (allowing repudiation when a party's "financial involvements were such as to show his inability to later perform" and refusing to distinguish "between unexcused inability and wilful intention not to perform").

Courts are likewise divided over whether breach occurs due to impossibility, where the promisee is not aware of the impossibility. *Contrast Sequa Corp. v. Gelman*, 1996 WL 79876, at *3 (S.D.N.Y. 1996) (refusing "to allow [a] defendant to track back in time and claim the rights resulting from an alleged repudiation" from a time before the plaintiff "became aware" of the alleged breach), *with Mar-Kay Plastics, Inc. v. Alco Standard Corp.*, 825 S.W.2d 381, 383-84 (Mo. App. 1992) (ruling that the buyer repudiated through conduct even though the seller "was not even aware of the [conduct that constituted repudiation] until [five months later]").

upon electricity and RECs."); *id.* at 68 (holding that TXUPM could pursue remedies other than liquidated damages for "electricity deficiencies").

Having established the existence of an *annual* obligation to deliver a minimum quantity of both electricity and RECs, an "impossibility" theory of breach should not be adopted in this case for several reasons.

- FPL and TXUPM both consistently treated the annual delivery obligation as an obligation for which satisfaction or breach would be determined at the end of the period for delivery—namely, after the end of the contract year at issue. That behavior reflects the framework of the contract. Section 4.02 of the contract provides for an *annual* minimum megawatt hour requirement, not merely an annual RECs requirement. Further, section 4.05 states "the calculations under this Article IV are made based upon the actual amount of Net Energy and actual amount of RECs . . . ." Net Energy is defined as "the amount of electric energy in MWh produced by the Renewable Resource Facility and delivered to the Connecting Entity . . . ."

  Because the parties intended to evaluate performance based on the "actual amount" of energy produced, after the end of the contract year, FPL never indicated that it had reached a point at which it would be impossible to perform because the amount of electricity exceeded the maximum amount it could produce in the remaining days left in the contract year—despite the fact that it had the information to do so. And TXUPM never attempted to determine whether FPL had reached a point at which it would be impossible to perform. Treating the moment of impossibility as itself a breach or repudiation would disregard the parties' course of dealing and course of performance, as well as their implicit understanding that breach would be determined at the end of the year. TEX. BUS. & COM. CODE § 1.303.

- FPL has *never* advanced this theory in connection with this dispute. It has never identified the moment when the remainder on its annual quantity requirement exceeded the maximum amount of wind energy it could produce in any of the contract years at issue. As a result, there is no evidence in the record to suggest that the moment of impossibility was reasonably calculable; FPL would not necessarily have advised TXUPM if it was constructing additional capacity or if some of its theoretical capacity was inoperable. Moreover, FPL has *never* presented evidence of cover purchases that TXUPM allegedly made after and in response to impossibility of performance. To the contrary, FPL's entire point is that TXUPM engaged in real-time balancing activity "daily, and throughout the contract term"—*regardless* of, and both before and after, the moment at which any such impossibility might have occurred. FPL Supp. Br. 17.

- In fact, FPL argued *against* this theory in the district court. The record shows FPL argued at the charge conference that it could not be in breach during the year, but only after it failed to pay TXUPM for the Annual Deficiencies. 24RR:21-24. Moreover, TXUPM tried to put forth a damages model based upon FPL's monthly forecasts during the year and FPL opposed calculating damages based on short-term forecasts as "not really in compliance with the damages under the contract of an annual quantity." 9RR:22-23. FPL's damages expert argued that TXUPM could not base its damages on prices paid during a year because FPL would not be in breach during the year. 5RR:254-55.

- And, under the facts of this case, it would be impossible to determine the extent of the breach even if its inevitability was known. For example, assume that on December 1 the amount remaining on the annual quantity obligation is 100,005 kWhs and FPL could only produce 99,995 kWhs for the rest of the year at maximum capacity. Although the inevitability of the breach is then known, the quantity of the deficiency is not. The breach could be as low as 10 kWhs, if FPL produced at maximum capacity for the rest of the year. It could be as high as 100,005 kWhs, if FPL produced no more wind energy for the rest of the year. And it could fall anywhere in between. The point is that the quantity would be unknowable until the contract year was over and as the framework of the contract makes clear it does not make sense to require any action by TXUPM until the full quantity of the deficiency is known.

Thus, the Court need not decide whether an "impossibility" theory of breach should be established under Texas law because it would be inappropriate to the facts at issue here.

### *Even if an "impossibility" theory of breach is adopted, it undermines FPL's theory of cover damages and supports TXUPM's theory of market damages.*

A case is governed by the market price damages statute, not the cover damages statute, unless the buyer purchased substitute goods after a breach by the seller. So determining whether or not a case is subject to cover damages involves two steps: (1) first, identify the relevant moment of "breach," and (2) second, determine whether the buyer made a substitute purchase "after" that breach. *See* TEX. BUS. & COM. CODE § 2.712.

If this Court adopts the "impossibility" theory of breach, it would actually *support* TXUPM's theory of market damages and *completely undermine* FPL's theory of cover damages. Adoption of the impossibility theory requires acceptance that breach under the contract occurs on an annual, not daily, basis. This squarely contradicts FPL's cover theory that TXUPM made cover purchases "daily, and throughout the contract term," FPL Supp. Br. 17, and thus bolsters TXUPM's well-supported position that the default rule of market damages should be applied.

According to FPL, breach occurs, not annually, but on a *daily* basis *throughout the contract year*, every time FPL misses a daily forecast. *See*, *e.g.*, FPL Supp. Br. 4 ("Each day the Wind Farms provided TXUPM with projected generation for the following day."). And, FPL argues, TXUPM makes substitute purchases on a *daily* basis *throughout the contract year*, as part of its daily real-time balancing efforts. FPL theorizes that these purchases—made on a daily basis throughout the contract year—constituted cover purchases. *See*, *e.g.*, FPL Supp. Br. 17 ("Because delivery was ongoing—hourly, daily, and throughout the contract term—the parties built real-time cover into the contracts.").

Adoption of the "impossibility" theory of breach undermines FPL's theory for two reasons. First, it negates FPL's *daily* breach theory because a breach occurs only at the moment it is deemed impossible for FPL to deliver the annual minimum quantity rather than on a daily basis as daily forecasts are missed. Second, it negates FPL's cover theory because FPL's entire point is that TXUPM engaged in the *same* real-time balancing activity "daily, and throughout the contract term"—*regardless* of, and both before and after, the moment at which any such impossibility might have occurred. *See generally* TXUPM Supp. 10-18.

### *In any case, because FPL has never advanced an "impossibility" theory of breach and cover damages, it is waived.*

FPL has never argued, let alone presented evidence to prove, this "impossibility" theory of breach and cover damages. *See Powell v. Knipp*, 2015 WL 4653231, at *10 (Tex. App.—Dallas 2015, no pet. h.) (Evans, J.) (ruling that issues not raised in an opening brief "are ordinarily waived and may not be considered by an appellate court").

\* \* \*

This case should be remanded. The relevant breach in this case is the annual quantity obligation, not daily forecasting, as FPL contends. And FPL has never presented an annual impossibility theory of breach—let alone an annual impossibility theory of cover. To the contrary, FPL's theory of the case *rejects* an annual impossibility theory of cover.

Accordingly, the Court should remand for further proceedings on market price damages, now that this Court's reversal of the district court's ruling on transmission capacity has been upheld by the Texas Supreme Court.[2]

---

[2] Remand is also appropriate regardless of how the Court ultimately resolves FPL's argument under section 1.305. Under the "majority view," TXUPM is simply required to prove market price damages under section 2.713, and nothing more. *Tongish v. Thomas*, 840 P.2d 471, 475 (Kan. 1992). *See also id*. at 476 (describing FPL's proposed rule as "sharply criticized" and

*(Cont'd on next page)*

Sincerely,

*/s/ James C. Ho*

James C. Ho

---

*(Cont'd from previous page)*

"unfortunate" "minority rule"). At trial, TXUPM amply proved its market price damages. 20RR:221. But TXUPM can—and if the Court directs, will—separately show that it was badly hurt by FPL's massive breach, and that there is accordingly no conflict between sections 1.305 and 2.713 of the UCC in this case in any event.

In 2000, FPL guaranteed TXUPM a low, long-term contract price. Electricity prices then skyrocketed in the years 2002 to 2005. So as a result, FPL's breach either forced TXUPM to buy energy at market prices far above contract price—or deprived TXUPM of the opportunity to re-sell FPL's energy at those same high market prices. *See generally* 47CR:11511; TXUPM Supp. Reply 11. To respond to the hypothetical posed by Justice Whitehill: If a seller fails to provide widgets, but the buyer happens to have enough widgets "in its back pocket," the seller still harmed the buyer if the buyer could have made a healthy profit by re-selling the undelivered widgets—as TXUPM indisputably could have done here.

**GIBSON DUNN**

### CERTIFICATE OF SERVICE

I hereby certify that, on this 23rd day of October, 2015, I caused a copy of the foregoing document to be served electronically upon counsel for Appellees/Cross-Appellants FPL Energy, LLC; FPL Energy Pecos Wind I, LP; FPL Energy Pecos Wind II, LP; and Indian Mesa Wind Farm, LP.

| | |
|---|---|
| Nina Cortell | Jeffrey Tillotson |
| State Bar No. 04844500 | State Bar No. 20039200 |
| nina.cortell@haynesboone.com | jmt@lynnllp.com |
| Anne M. Johnson | John Volney |
| State Bar No. 00794271 | State Bar No. 24003118 |
| anne.johnson@haynesboone.com | jvolney@lynnllp.com |
| Ben L. Mesches | LYNN TILLOTSON PINKER & COX, LLP |
| State Bar No. 24032737 | 2100 Ross Avenue, Suite 2700 |
| ben.mesches@haynesboone.com | Dallas, TX 75201 |
| Ryan Paulsen | Telephone:  (214) 981-3838 |
| State Bar No. 24060397 | Facsimile:  (214) 981-3839 |
| ryan.paulsen@haynesboone.com | |
| HAYNES AND BOONE, LLP | |
| 2323 Victory Avenue, Suite 700 | |
| Dallas, Texas 75219 | |
| Telephone:  (214) 651-5000 | |
| Facsimile:  (214) 651-5940 | |

 /s/ *James C. Ho*
James C. Ho